The CONE CORPORATION, et al., Plaintiffs,

v.

HILLSBOROUGH COUNTY, et al., Defendants.

No. 89–540–CIV–T–17(A).

United States District Court, M.D. Florida, Tampa Division.

Oct. 16, 1989.

---

**670**

Herbert P. Schlanger, Atlanta, Ga., Maxwell G. Battle, Jr., R. Michael Deloach, Maxwell G. Battle, Jr., P.A., Dunedin, Fla., for plaintiffs.

Claude H. Tison, Jr., Michael D. Malfitano, MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for defendants.

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

KOVACHEVICH, District Judge.

This cause of action is before the Court on the following motions, responses, and documents in support thereof:

1. Plaintiffs' motion for preliminary injunction and memorandum in support thereof, filed April 18, 1989. (Docket Nos. 3 and 4).

2. Affidavit of Douglas P. Cone in support of motion for preliminary injunction, filed April 27, 1989. (Docket No. 6).

3. Defendants' analysis and summary of *City of Richmond v. J.A. Croson,* filed May 26, 1989. (Docket No. 13).

4. Plaintiffs' notice of supplemental authority and discussion thereof, filed June 9, 1989. (Docket No. 16).

5. Transcript of evidentiary hearing of June 16, 1989, filed June 19, 1989, and exhibits thereto. (Docket No. 20).

6. Plaintiffs' separate memorandum of analysis of *City of Richmond v. J.A. Croson,* filed June 27, 1989. (Docket No. 30).

7. Deposition of E.L. Bing, taken June 21, 1989, and filed July 6, 1989.

8. Deposition of Spencer Albert, taken June 21, 1989, and filed July 6, 1989.

9. Deposition of Robert Gilder, taken June 21, 1989, and filed July 6, 1989.

10. Plaintiffs' response to Defendant's memorandum in opposition to Plaintiff's motion for a preliminary injunction, filed July 17, 1989. (Docket No. 25).

11. Defendants' memorandum in opposition to petition for preliminary injunction, filed July 19, 1989. (Docket No. 26).

Complaint in this cause of action was filed April 18, 1989, by Plaintiffs, The Cone Corporation; J.W. Conner & Sons, Inc.; Cone Constructors, Inc.; and Dallas 1 Construction & Development, Inc. against Defendants Hillsborough County and Larry J. Brown, Administrator of Hillsborough County.

The complaint alleged Defendants had, since at least 1984, engaged in a pattern and practice, and has had a custom and policy, of discrimination in the construction industry in favor of certain racial and ethnic groups and in favor of females, pursuant to County Resolution No. R88–0173 and Administrative Order implementing same. On August 15, 1989, Plaintiffs amended the complaint to add the following Plaintiffs: Bulger Contracting Co.; Boyce Company; S & E Contractors, Inc.; Woodruff & Sons, Inc.; and Suncoast Utility Contractors Association.

### FACTUAL BACKGROUND

1. Plaintiffs are challenging Hillsborough County Board of County Commissioners Resolution No. R88–1073 (the Resolution), adopted by the Board of County Commissioners (Board or Commission) June 29, 1988, and implemented through an Administrative Order. The current resolution is the latest in a succession of similar resolutions, the first was passed in 1984.

2. The preceding resolutions were: No. R84–1003, adopted June 20, 1984; R86–0170, adopted August 27, 1986; and R87–0249, adopted September 8, 1987. The current Resolution, as well as the preceding resolutions, implement a minority business contracting program.

3. In 1978 the Board adopted a minority-female vendor contractors program, which was essentially a voluntary program. The program required Hillsborough County

(the County) to solicit the utilization of minority and female businesses in procurement and required contractors consider utilizing them on County construction projects. (Trial Transcript (TT) pgs. 8–9). The contractors were to list on the bid form their subcontractors; and, on a separate form, were asked to indicate if they solicited minority participation. (TT pg. 12).

4. Starting in 1981, the Equal Opportunity Office (EOO) was directed to review the affirmative action plan to determine if it was "inclusive of all elements designed to perpetrate discrimination." (Def. Ex. 35; TT pg. 9). In the process of reviewing the program, there were several steps taken, including:

I. A survey was conducted by contacting the Greater Tampa Chamber of Commerce, City of Tampa License Department, Hillsborough County and the Planning Commission to determine the total number of businesses in the County and how many were minority businesses. The survey was unsuccessful as the agencies contacted did not maintain the statistics necessary to the inquiries. (Def. Ex. 35).

II. An analysis of statistical data on minority businesses was collected, to "justify the need for" a minority business program. The analysis included reviewing contracts awarded to businesses by the County in the previous three (3) years. Then a determination was made as to what percentage and dollar value of these contract awards were to minorities and female businesses. The conclusion of that study was that minorities (in particular Blacks and Women) were significantly underrepresented in such awards. (Def. Ex. 35).

III. A study on minority business enterprises (MBEs), as outlets for placing CETA trainees, was conducted by J.H. Lowry and Associates, on contract with the U.S. Department of Labor. Although the study was directed at the City of Tampa, the EOO Director recommended that the report be utilized to "correct current effects of past discrimination in employment and contracting for goods, services and construction." The report stated, without evidentiary support, that the primary obstacles for MBES were: 1) lack of access to capital; 2) inability to obtain adequate surety bonding; and 3) lack of capable managers and adequate training programs. (Defs. Ex. 11).

IV. Surveys were done of County expenditures compared with the percentages of business done by minority or female businesses.

a. The EOO reported on March 1, 1989, on the survey of the fiscal years 1979/80 and 1980/80. The report is reproduced and attached hereto as Exhibit A.

b. A minority achievement report from the Director of the Office of Operations was made to the EOO on August 18, 1982. The report encompassed the period from July 12 to July 30, 1982, and addressed the racial breakdown of minority vendors who desired to do business with the County. The report is reproduced and attached hereto as Exhibit B. (Defs. Ex. 15).

c. A second progress report on MBEs was made for the period from October 31, 1982 to July 31, 1983. The report stated that the efforts had been increased to solicit minority and women businesses, but that there was still a disproportionate number of "minority businesses not obtaining purchases." The reasons provided for the disparity were: 1) a substantial amount of dollars spent by the purchasing department were in the commodities area and minority businesses for commodities were at the retail sales level which increased the price; 2) minority businesses were not aware of the structure for procurement, which limited their resources for obtaining bid information; 3) prime contractors did not solicit or award minority subcontracts; 4) prices quoted by MBEs tended to be higher due to financial status; and 5) obtaining bonds was difficult. The statistical report appended to the report is reproduced and attached hereto as Exhibit C. (Defs. Ex. 17).

d. In a November 5, 1989, summary of the "numbers used in the development of the County's Disadvantaged Minority/Disadvantaged Women Business Enterprise Program (DMBE/DWBE)," the MBE Administrator provided the following as additional sources in determination of underrepresentation: 1) the 1980 Census of Hillsborough County as compared to the number of minority business (Reproduced and attached as Exhibit D, Table A); 2) notification from Office of Revenue Sharing to County to correct past practices in hiring of females and minorities; and 3) citation by the Environmental Protection Agency (EPA) for failure to provide minority and women businesses with a fair share of participation in procurement activities. (Def. Ex. 35).

e. The County Commission held several workshops on the subject of minority businesses. (Pl. Exs. 16, 18, and 22 and Defs. Ex. 24, 22 and 27).

5. Defendant's witness Jacqueline Barr testified that during the time prior to the adoption of the first resolution, the Federal Department of Housing and Urban Development (HUD) directed the County to implement minority participation, at twenty-five (25%), on HUD sponsored projects. (TT pg. 10).

6. Ms. Barr also testified that the County received various complaints alleging discrimination existed in County construction and procurement. In response to these complaints, the County held a series of public and private meetings to gather input from the minority and majority business community. The public was invited to participate in these meetings by notice through news releases and announcements over the radio and in the newspapers. (TT pg. 29). The County also sent letters announcing the meeting to those persons that they knew were interested, such as a person who had made a previous complaint. (TT pg. 30).

7. The County witness, Jacqueline D. Barr, testified that the County received indication of "discrimination" at the public hearings and that she "thought" approximately sixty percent of the minority businesses in attendance complained, including Blacks, Hispanics and Women, and the complaints were *directed to the actions of the prime contractors.* (TT pgs. 31–31).

8. At the time of the adoption of the first resolution, Robert Gilder was the President of the NAACP, and, as such, he notified the County when he received complaints. (Depo. pgs. 4–6). On July 29, 1981, he wrote to Chairperson, Jan Platt, urging the County Commission to take certain actions aimed at assisting minorities, especially Blacks, in participating in County procurement and contracting. (Def. Ex. 12).

9. Mr. Gilder's "data" was based on information and complaints received from other persons. He did little or *no* independent investigation of the complaints; he simply passed them on to the County for their edification. (Depo. pgs. 9, 24, 33–34). In addition, Mr. Gilder participated in workshops, testified before the Commission, and served on committees in this area. (Depo. pg. 13).

10. Mr. E.L. Bing was a County Commissioner for two (2) years between March 1983 and May 1985. (Depo. pg. 5). During his tenure, he received complaints from Blacks and other minority businesspersons regarding their exclusion from County work based on race and sex. (Depo. pgs. 5–6). The complaints were "continuous." (Depo. pg. 6).

11. In Mr. Bing's *opinion,* discrimination existed in County contracting business as to the amount of work awarded to Blacks, Hispanics, and Women. Further, in his *opinion,* the discrimination was practiced by the County and the prime contractors. (Depo. pgs. 9–10). For example, there were allegations made of "price-fixing" and "bid shopping" for Whites, but Mr. Bing stated he did not follow the industry and he doesn't know "how true it was." (Depo. pg. 15).

12. Mr. Bing testified that as a result of the complaints the Commission directed that a study be made. The studies were shared with the Commission at workshops.

(Depo. pgs. 8, 16). The Commission then designed a program to correct past discrimination and correct the imbalance against Women, Blacks, and Hispanics. (Depo. pg. 19). Ms. Barr testified that the program was designed to *ensure equitable distribution* of County funds (including federal funds awarded to the County) along racial, ethnic and sexual lines. (TT pgs. 46, 63).

13. The current resolution R88–0173 was adopted at a special Commission meeting of June 29, 1988. The resolution reads in relevant part:

WHEREAS, the Hillsborough County Board of County Commissioners (BOCC) has reviewed historical statistical data regarding the expenditure of funds to minority business enterprises, disadvantaged minority business enterprises, disadvantaged women business enterprises (MBE/DMBE/DWBE) as defined by Hillsborough County in comparison to the total expenditure of funds in Hillsborough County's procurement program; and

WHEREAS, based upon the aforementioned data, the BOCC finds that such business enterprises have been disproportionately under-represented as participants in and recipients of Hillsborough County's procurement program involving contracts for material, supplies and/or the provision of consulting and construction services to the County; and

WHEREAS, the BOCC recognizes its obligations to ensure that its contracting practices and contracting practices of its contractors and subcontractors provide a full and equitable opportunity, through affirmative action, to MBE, DMBE and DWBE firms; and

WHEREAS, the BOCC has reaffirmed its commitment to Equal Employment Opportunity and Affirmative Action.

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF HILLSBOROUGH COUNTY, assembled this 29th day of June, 1988, as follows:

1. *Policy.* It is the policy of the Hillsborough County Board of County Commissioners that MBE/DMBE/DWBEs shall have the maximum opportunity to participate in the County's procurement programs and to encourage such participation by such business enterprises.

2. *Objectives.* The objectives of the MBE Program are to take specific affirmative action to eliminate discrimination and the effects thereof, to ensure that construction contractors and subcontractors provide equal opportunity through employment of minorities and women, and to increase participation by minority businesses in all procurement activities.

3. *Applicability.* This resolution shall apply to all procurement activities under the Hillsborough County Board of County Commissioners.

4. *Appendix.* The attached document marked "Appendix A: is incorporated as a part hereof by this reference. (The appendix is not attached hereto).

5. *Definitions.* Definitions are included in the appendix to this resolution.[1]

6. *Discrimination Prohibited.* No person shall be excluded from participation in, denied the benefits of, or otherwise discriminated against in connec-

---

**1.** Because the definitions of the Resolution are not made part of this Order, the Court would like to take note of one definition which it finds particularly relevant to the issues raised herein. At Number 17 the Resolution defines Minority Group Members as follows:

Member(s) or individual(s) who are citizens or lawful permanent residents of the United States and who are Black (not of Hispanic origin), Hispanic, American Indian, Alaskan Native, Asian, or Pacific Islander. *Women are considered as minority group members for purposes of this program.*

a. Black–a person having origins in any of the black racial groups of Africa.

b. Hispanics–a person of Spanish or Portuguese culture with origins in Mexico, South America, Central America, or the Caribbean Islands, regardless of race.

c. Asian–a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands.

d. American Indian or Alaskan Native–a person having origins in any of the original peoples of North America.

e. Woman–For purposes of this program, women are considered as minority group members.

tion with the award and performance of any Hillsborough County procurement action on the grounds of race, color, national origin, or sex.

7. *Program Administration.* The County Administrator has the general responsibility for administering the MBE Program and implementing the BOCC's Policy. The Equal Opportunity & Human Relations Department, Director shall be responsible for developing, managing, and implementing the MBE Program on a day-to-day basis; and such other responsibilities as are set forth in this Resolution. The County Administrator may promulgate such administrative procedures consistent with this Resolution or any Federal or State law, regulation or grant requirement. In addition, for those projects which are in whole or in part funded by federal grants the County Administrator shall amend administrative procedures to be consistent with amendments to the pertinent Federal grant regulations or laws.

8. *Procedures to Ensure that MBE's Have an Equitable Opportunity to Compete for Contracts and Subcontracts.* The County shall use the following techniques to facilitate MBE participation in contracting activities:

a. The County will arrange adequate time for the submission of bids and bid specifications so as to facilitate the participation of MBE/DMBE/DWBEs.

b. The County, to the extent economically and legally feasible, will break down the scope of large projects into smaller contractual parts to facilitate the participation of smaller businesses.

c. The County will hold seminars or workshops periodically to acquaint the minority business community with the requirements and scope of its procurement activities. These efforts will be coordinated with organizations that are familiar with and willing to reduce problems experienced by MBE/DMBE/DWBEs.

d. The County will review and evaluate for certification those applicants for the MBE Program. This review will include all documentation necessary to es-

tablish the legitimacy of the applicants' firm. Only those businesses certified by Hillsborough County, by the time of bid opening, will be counted toward goal attainment.

e. The County will provide contracting opportunities for professional services pursuant to Section 287.055 Florida Statutes, known as the "Consultant's Competitive Negotiation Act" as well as other professional services solicited through the competitive bid or Request for Proposal process. MBE Program procedures will be included in each solicitation.

f. The County will apply appropriate penalties to bidders who fail to perform properly, by commission or omission, of acts of a serious nature that violate the intent of the MBE Program and other relevant Federal and State laws.

g. All bid specifications will require prime contractors to make good faith efforts to utilize MBE/DMBE/DWBEs.

h. All prime contractors will be required to complete documentation listing all minority contractors contacted; giving the results thereof.

9. *Directory.* The County shall have available resources, including directories or lists, to facilitate in the identification of County certified MBE/DMBE/DWBEs whose skills are needed in the performance of County contracts. The County shall make such resources available to bidders in their efforts to meet the MBE Program requirements.

10. *Overall Goal.* The County hereby establishes an annual goal of twenty-five percent (25%) for the MBE Program. This goal applies to all construction related procurement on projects that are $100,000.00 and above. There is a 5% goal for nondisadvantaged minority business enterprises (MBEs) and a 20% goal for disadvantaged minority and disadvantaged women business enterprises (DMBEs/DWBEs). Where possible, the desired breakdown of the MBE/DMBE/DWBE participation should reflect 18% of the contract price

being provided to DMBEs and 2% to DWBEs. Target percentages are as shown:

MBE (NonDisadvantaged)

| | |
|---|---|
| – | 5% goal |
| Black | 10% |
| Hispanic | 7% |
| Women | 2% |
| Other | 1% |

A five percent (5%) annual goal is established for purchase of goods and services under vendor program and a five percent (5%) annual goal is established for consultant services contracts.

The County will establish goals for MBE/DMBE/DWBE participation on a project by project basis. However, goals established for an individual project shall not exceed fifty percent (50%).

11. *Set–Aside.* The County will provide a set-aside provision whereby specific projects in an estimated amount of $100,000.00 or less may be available for bid by DMBE/DWBE firms only. The vendor program will allow for set-aside of specific commodity groups for bid by DMBE/DWBE firms only.

12. *Employment Goals.* A goal of 17.9% has been set for minority group employment and 6.9% for women employment on County construction contracts regardless of funding source. These levels are consistent with the levels established by the U.S. Department of Labor for this Metropolitan Statistical Area (MSA). Contractors awarded such construction projects should make every tangible good faith effort to achieve these minority and women employment goals.

13. *Complaints.* Any complaint of discrimination received by Hillsborough County concerning the MBE Program will be investigated by the Equal Opportunity Office.

14. *Prompt Payment Policy.* Every contract let by the County for the performance of work shall contain a provision requiring the prime contractor to certify in writing that all subcontractors and suppliers have been paid for work and materials from previous progress payments received (less any retainage) by the prime contractor prior to receipt of any further progress payments. During the contract and upon completion of the contract the County may request documentation to certify payment to subcontractors or suppliers. This provision in no way creates any contractual relationship between any subcontractor and the County or any liability on the County for the contractor's failure to make timely payment to the subcontractor.

15. *Citizen Participation Committee.* A Citizen Participation Committee shall be established for the purpose of relaying concerns of minority contractors and vendors, non-minority contractors and citizens-at-large to the County about the operation of the MBE Program.

16. *MBE Program Period.* The BOCC shall annually review the MBE Program to assure achievement of its purpose while still maintaining the flexibility and viability of the County to transact its business.

17. *Waiver.* At any time prior to the advertisement for bid of a contract, the County Administrator, subject to BOCC approval, or the BOCC at any time may grant a partial or complete waiver of the MBE/DMBE requirements for any contract in which it is demonstrated that minority participation cannot be achieved as required by the MBE/DMBE Program without detriment to other considerations of the public health, safety or welfare including adverse financial impact to the County. However, when evaluating competitive bids/quotes for award in which the apparent responsible low bidder is determined to be nonresponsive to MBE requirements, the bid shall be awarded to the low bidder responsive to MBE requirements, unless the bid is more than 15% or $100,000.00, (whichever is less) of the qualified low bid without reference to MBE goals.

18. *Recission* (sic). The provisions of the Resolution are effective immediately upon adoption and shall apply to all invitations to bid advertised after adoption of this Resolution. Invitations to bid advertised prior to adoption of this Resolution shall be governed by Hillsborough

County Resolutions 84–0103, 85–1215, 86–170 and 87–0249. Within forty-five (45) days the County shall provide procedures for the full implementation of this Resolution by Executive Order(s). (Pl.Ex. 1).

14. Resolution R88–0173 has been implemented by Administrative Order 88–3, issued July 11, 1988. (Pl.Ex. 2).

15. Spencer Albert is the manager of the Minority Business Section (MBS) of the Department of Equal Opportunity and Human Relations for the County. Mr. Albert is primarily responsible for implementing the Minority Business Enterprise Program. In addition, his office is responsible for certifying "bona fide" minority businesses within the program's definition; reviewing contract bids; and monitoring minority work. (Depo. pgs. 4–5). At his deposition, Mr. Albert testified to the following facts in regard to the MBE Program:

A. The following are the steps the County utilizes in implementing the program:

1. The Goal–Setting Committee (GSC) establishes a goal for a project based on advisement from the Capital Projects Committee (CPC). The CPC sends a memorandum to the GSC notifying them that there is a project and delineating the subcontractable areas that will be provided.

a. Mr. Albert's office reviews the available and eligible minority firms to ensure that in each subcontractable area there is at least three eligible firms in each area. (Depo. pg. 7). Three is the minimum number of MBEs that must be available in a subcontract area in order to set a goal. (Depo. pg. 11).

b. From that review, the MBS establishes a recommended goal which is taken to the GSC for discussion. (Depo. pg. 7). The GSC discusses such issues as the complexity of the work and whether or not a subcontractable area is a "critical path" item. (A "critical path" item is one that the consultant, project manager or County engineer considers essential for the general contractor to control to "ensure the project moves toward completion in a timely fashion.") (Depo. pg. 8). The goal is set by the GSC.

2. Next the project is advertised and a pre-bid conference is scheduled. The pre-bid conference provides an opportunity to contractors to ask questions regarding technical specifications; for the County to explain the bidding procedures; and for the County to explain the MBE Program requirements. (Depo. pg. 14).

3. After the bids are received by the County, the three apparently low bids are transmitted to Mr. Albert for review. The Capital Projects Department notifies those three bidders of their status and they are given five (5) days to submit to the Capital Projects Department executed minority business contract(s). Those executed contracts are then forwarded to Albert for review. (Depo. pg. 15).

4. Mr. Albert reviews the bids in two areas: 1) for compliance with Executive Order 11246 that established this geographic area as a standard metropolitan and statistical area and established hiring goals for minorities and women for skilled craft of construction (17.9% for minorities and 6.9%) for women and 2) for compliance with the MBE Program requirements. (Depo. pgs. 17, 18).

5. As to the MBE goals, Albert reviews the low bids to determine if the proposals equal or approximate the project goals and whether the executed subcontract agreements are consistent with the proposals in terms of the name of the MBE, the scope of the work, and the dollar value. If so, it is recommended that the bid be awarded. (Depo. pgs. 18, 19).

6. If the goal is not met, the good faith efforts of the low bidder are reviewed to determine if the bid is responsive. (Depo. pg. 19). There are factors to be weighed in consideration and determination of whether or not the asserted good faith efforts make the bid otherwise responsive, including, but not limited to: attendance at the pre-bid conference; no-

tification of MBEs in a given area of opportunity to bid; offer of assistance to MBEs in reviewing plans; bonding and insurance assistance; bids made in last six (6) months and their responsiveness; and whether or not bid provides all price quotations received and explanation as to why an MBE not selected. (Depo. pgs. 20, 21).

7. If the bid is determined non-responsive, (failure to meet the goal or to document good faith efforts) the bidder is notified by the Capital Projects Department and is given a set time in which to file a letter of protest to that department. (Depo. pg. 22). Protest letters are responded to by Mr. Albert and a decision is made by a Protest Committee. (Depo. pg. 23).

8. At this time, the Protest Committee reviews Article 17 of the Resolution to determine if the next low bid is fifteen percent (15%) or $100,000.00 higher than the low bidder; if so, the goal is waived and the bid is awarded to the "non-responsive" low bid. (Depo. pg. 24). If not, and if the decision as to non-responsiveness is not changed, a report is made to the County Administrator, who makes the final decision. (Depo. pg. 23).

B. The County operates on a fiscal year from October 1 to September 30. At the time of the deposition on June 21, 1989, the County had goals set up for approximately fifty (50) projects (Depo. pg. 9).

C. The goals set ranged from zero (0%) to fifty percent (50%), which is the maximum under the Resolution. For the current fiscal year the County has two (2) projects with a zero percent (0%) goal and three (3) projects with a fifty percent (50%) goal. (Depo. pgs. 10–12).

D. For all projects where goals have been set for the current fiscal year, the total estimated value is $107,438,197.00 and the MBE participation is $21,027,976.72 or 19.6%. The overall County goal, as set by the Resolution, is twenty-five percent (25%). (Depo. pg. 13). The Board has awarded contracts valued at $79,547,904.15 and MBE contract value has totaled $12,-432,047.03 or 15.6%.

E. One project goal was in the past altered, downward, as a result of a bidder's opposition to the goal as being too high. The goal had been set at twenty-three percent (23%) and was adjusted down to 13.2%. (Depo. pgs. 14, 15).

F. The Resolution provides that the goals may be waived for a particular project. A goal is waivable at the staff level by the GSC or the Board itself may waive a goal, prior to the advertisement of the project or at the time of the bid recommendation. (Depo. pg. 16). Waivers have taken place in the past at both the staff and the Board level. (Depo. pgs. 11, 15–17).

G. In the current fiscal year, of the approximately thirty-three bids reviewed by Mr. Albert, five (5) low bids have been deemed "non-responsive" at first and then found to be "responsive" because they documented their good faith efforts or because the goal was waived. (Depo. pgs. 24–27). There have not been any low bids that have been rejected in the current fiscal year due to MBE requirements.

H. Mr. Albert testified that the City of Tampa had a similar program with a minority goal of twenty-five percent (25%) for all projects, which goal was suspended on or about March 17, 1989. (Depo. pg. 30, 31, 35). Based on the City's annual report, Mr. Albert testified that for the last fiscal year (October through September) the City achieved a twenty-one or twenty-two percent goal. (Depo. pg. 32). The City's third quarter report shows that since the goals were suspended, the percentage achieved had been 5.2 percent. (Depo. pg. 35). The figures breakdown as follows: Black 0.17%, Hispanic 4.35%, Female 0.48%, and Other 0.21%. (Def. Ex. (to Depo) 40).

## CONCLUSIONS OF LAW

In order to resolve the motion for preliminary injunction, the Court must address the following issues: 1) the likelihood that the moving party will ultimately prevail on the merits of the claim; 2) the irreparable nature of the threatened injury; 3) the potential harm that might be caused to the opposing parties or others if the order is

issued; and 4) the public interest, if any. Since an injunction is an extraordinary and drastic remedy, it will not be granted unless the movant clearly carries the burden of persuasion as to all four prerequisites. *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983).

## I. *Irreparable Injury*

Irreparable harm is distinguished from mere injury, which can be adequately compensated through the award of money. *Id.,* at 1520. Assuming arguendo that the County's MBE program is in violation of the Equal Protection Clause of the Fourteenth Amendment, continuation of the program will result in a perpetuation and extension of the deprivation of Plaintiff's constitutional rights.

Said continuing deprivation, standing alone, is sufficient to constitute irreparable injury. It is also apparent that financial hardship with difficult and speculative money damage calculations *may* occur if the MBE program is enforced during the pendency of this case. The irreparable injury issue weighs in favor of granting a preliminary injunction.

### Potential Harm to Defendants of Others

The Court does not find, and Defendants do not postulate, any potential harm to Defendants that outweighs the harm to Plaintiffs. The granting of a preliminary injunction here will not deter the County from continuing its construction projects. The injunction will prevent the present application of the MBE Resolution by the County in the awarding of construction contracts; it will not prevent the awarding of contracts per se. Nor is there any explicated potential harm to others which outweighs the harm which may occur to Plaintiffs. Therefore, the Court concludes that this factor weighs in favor of issuance of a preliminary injunction.

### Public Interest

Public interest, in this Court's opinion, is always served by ascertaining and assuring that programs promulgated by legislative bodies, such as the County Commission, conform to the provisions of the United States Constitution. This factor weighs in favor of preliminary injunction herein.

### Likelihood of Success on the Merits

The pivotal issue in this case is the likelihood of Plaintiffs being successful on the merits of the cause. If the Court determines that this factor weighs in favor of issuance of a preliminary injunction, the matter is resolved in favor of Plaintiffs.

## II. *The Impact of City of Richmond v. Croson*

The parallels between the facts of the instant case and those of *City of Richmond v. J.A. Croson Co.,* — U.S. —, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), are striking. In *Croson,* the Supreme Court struck down, as unconstitutional, a Minority Business Utilization Plan requiring prime contractors to subcontract 30% of the total dollar value, of each awarded city construction contract, to a Minority Business Enterprise (MBE). A careful analysis of the six opinions written in *Croson* is critical to the proper resolution of the instant dispute.

The Court has devoted considerable time and effort to reviewing the facts of the instance case and analyzing those facts in light of the *Croson* case; and, it has only been due to the ever increasing press of criminal matters that this order has not previously been issued by this Court. After spending valuable judicial time on this case, and after reviewing the *"best evidence"* brought forward by the defendants, the Court is at a loss to understand why there has been no stipulation for entry of a preliminary injunction herein. This Court is forced to question the good faith of Defendants in opposing the efforts of Plaintiffs to suspend the MBE program of Hillsborough County, Florida.

It is very clear to the Court, from its review, that the MBE program does not meet the tests explicated by the *Croson* court. In many instances this Court could substitute the words "Hillsborough County" for the words "City of Richmond" or "Richmond" in the *Croson* decision and have a true and relevant statement. Anyone familiar with the record of this case could have, and should have, recognized the necessity for suspending the program

pursuant to *Croson*, as did the City of Tampa, which Defendants' own witness, Spencer Albert, testified had a similar minority program. The Court's time and the parties' time, fees and expenses would have been better served by suspending this MBE program and working on a new program which conforms to the plurality's standards for a MBE program. The decision herein brings into question all Hillsborough County construction bids let subsequent to the issuance of *Croson* and may well result in other litigation, in this or other courts.

### A. The Factual Background The Croson Plurality–Part I

In the Spring of 1983, Richmond, Virginia's City Council adopted a Minority Business Utilization Plan (the Plan). As previously noted, the Plan required prime contractors to whom the City has awarded construction contracts to subcontract no less than 30% of the total dollar value of the contract to one or more MBE. This 30% set-aside did not apply to minority prime contractors.

Under Richmond's Plan, an MBE was defined as a business "at least fifty-one (51) percent of which is owned and controlled ... by minority group members." *Croson* (O'Connor opinion), at 109 S.Ct. page 713. Minority group members were defined by the City Council as "[c]itizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts." *Id.*, at 713. (See page 673 of this opinion to compare the Hillsborough County program definition).

Though enacted by Richmond's City Council, there were no geographic limits placed on the Plan. A minority owned business from anywhere in the United States could make use of the 30% set-aside. The self-styled "remedial" plan was "enacted for the purpose of promoting wider participation by minority business enterprises in the construction of public projects." *Id.*, at 713. (Similarly, the Court finds no evidence that the County's program was limited geographically).

Richmond's plan included provisions for waiver of the 30% set-aside. The Director of the City's Department of General Services was to issue rules allowing waiver in situations where a prime contractor proved to the satisfaction of the Director that the requirements of the Plan could not be achieved. *Id.*, at 713. (This waiver provision is similar to the "good faith" determination made pursuant to the Hillsborough County resolution).

The Richmond City Council adopted the Plan after a public hearing. Five citizens spoke against the adoption of the Plan; two voiced support. Advocates for the adoption of the Plan relied on a "statistical imbalance" between the percentage of Blacks in Richmond and the percentage of the City's prime construction contracts awarded to Blacks over the five year time period from 1978 to 1983: while Blacks composed 50% of the population of Richmond, they received only .67% of the prime construction contracts. *Id.*, at 714. (Again, compare the "evidence" presented in adoption of the Hillsborough County program, pages 670–673 of this opinion).

There was no direct evidence of any kind which tended to show that the City of Richmond discriminated along racial lines in the letting of contracts or that prime contractor's had discriminated against minority subcontractors. *Id.*, at 714. (Defendants here have presented *no* evidence that the County had discriminated in letting contracts and the "evidence" as to discrimination by prime contractors consisted of the conclusory statements that discrimination had occurred).

A quick review of the facts pertaining to the County's MBE program, as recited in this order, will, even to the most undiscerning eye, reveal the substantial similarity between this program and that of the Richmond Plan.

### B. The Croson Plurality–Part II

Justice O'Connor wrote for the plurality in *Croson* and was joined in Part II of the opinion by Chief Justice Rehnquist and Justices White and Scalia. The plurality examined the scope of Richmond's power to

adopt legislation designed to correct past discrimination.

Croson had argued, based on the Supreme Court's decision in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), that Richmond was bound to limit any race-based remedial effort to erasing the effects of its own discrimination. The City of Richmond contended that the Supreme Court was bound by its decision in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), asserting that Richmond had broad power to "define and attack the effects of prior discrimination" in Richmond's construction trade. The plurality could not accept either of those polar descriptions as to the scope of Richmond's authority.

Justice O'Connor distinguished *Fullilove* from the operative facts of *Croson.* In *Fullilove,* the Supreme Court upheld a minority set-aside contained in Section 103(f)(2) of the Public Works Employment Act of 1977, 42 U.S.C. Section 6701, *et seq.* Justice O'Connor brushed aside Richmond's contention that its remedial powers were as broad as those of Congress:

> What appellant ignores is that Congress unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. The power to "enforce" may at times also include the power to define situations which *Congress* determines threaten principles of equality and to adopt prophylactic rules to deal with those situations. (emphasis in original). *Id.,* 109 S.Ct. at 719.

Justice O'Connor further addressed the issue of the difference between the powers granted to the Congress and those granted to a state or local government, by stating:

> That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori,* the States and their political subdivisions are free to decide that such remedies are appropriate. Section 1 of the Fourteenth Amendment is an explicit *constraint* on state power, and the States must undertake any remedial efforts in accordance with

that provision. To hold otherwise would be to cede control over the content of the Equal Protection Clause to the 50 state legislatures and their myriad political subdivisions. The mere recitation of a benign or compensatory purpose for the use of a racial classification would essentially entitle the States to exercise the full power of Congress under s5 of the Fourteenth Amendment and insulate any racial classification from judicial scrutiny under s1. We believe that such a result would be contrary to the intentions of the Framers of the Fourteenth Amendment, who desired to place clear limits on the States' use of race as a criterion for legislative action, and to have the federal courts enforce those limitations. (cite omitted). (emphasis in original). *Id.,* at 719.

Justice O'Connor next addressed Croson's reliance on *Wygant,* in support of the proposition that Richmond could only correct the effects of its own past discrimination:

> It would seem equally clear, however, that a state or local subdivision (if delegated the authority from the State) has the authority to eradicate the effects of private discrimination within its own legislative jurisdiction. This authority must, of course, be exercised within the constraints of s1 of the Fourteenth Amendment. Our decision in *Wygant* is not to the contrary ...
>
> Thus, if the city could show that it had essentially become a "passive participant" in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system. (footnote omitted). *Id.,* at 720.

The plurality opinion asserted that "as a matter of State law", a city has control over its expenditure of public funds. It may spend its money to remedy discrimination in the private sector to the extent it can identify the discrimination with sufficient particularity to satisfy the Fourteenth Amendment. "It is beyond dispute that any public entity, state or federal, has a

compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *Id.*, at 720.

### C. The Croson Plurality–Part III–A

Again writing for the plurality, Justice O'Connor was joined in Part III–A by Chief Justice Rehnquist, Justice White, and Justice Kennedy. Beginning with the observation that the rights guaranteed under Section 1 of the Fourteenth Amendment are personal rights, guaranteed to every individual, the four justices concluded that Richmond's plan denied certain individuals the right to compete for a fixed percentage of contracts based solely upon their race.

Irrespective of the racial group to which these individuals belonged, such a plan implicated their right to be treated with equal dignity and respect. Any classification based upon race must meet the rigid test of strict scrutiny, wrote Justice O'Connor, since it is often next to impossible to discern a benign or remedial classification from an invidious or illegitimate one:

> Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype. *Id.*, at 721.

The plurality compared the Court's decision in *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) to the *Croson* case. In *Bakke*, the University of California employed a racial quota, as to the entering class of the medical school, and reserved 16 out of 100 seats for certain minority groups. The justifications postulated for the plan included the "desire to 'reduc[e] the historic deficit of traditionally disfavored minorities in medical school and the medical profession' and the need to 'counte[r] the effects of societal discrimination.'" *Id.*, 109 S.Ct. at 722.

Five members of the *Bakke* Court stated that none of the proferred interests could justify a plan that completely eliminated nonminorities from consideration of a specific portion of the opportunities for admittance in the medical school:

> Justice Powell's opinion applied heightened scrutiny under the Equal Protection Clause to the racial classification at issue. His opinion decisively rejected the first justification for the racially segregated admissions plan. The desire to have more black medical students or doctors, standing alone, was not merely insufficiently compelling to justify a racial classification, it was "discrimination for its own sake," forbidden by the Constitution. (cite omitted) Nor could the second concern, the history of discrimination in society at large, justify a racial quota in medical school admissions. Justice Powell contrasted the "focused" goal of remedying "wrongs worked by specific instances of racial discrimination" with "the remedying of the effects of 'societal discrimination,' an amorphus concept of injury that may be ageless in its reach into the past." (cite omitted) He indicated that for the governmental interest in remedying past discrimination to be triggered "judicial, legislative, or administrative findings of constitutional or statutory violations" must be made ... Only then does the Government have a compelling interest in favoring one race over another. *Id.*, at 722–23.

The four plurality members of the *Croson* Court made it clear that the strict scrutiny standard is to be applied to all racial classifications, regardless of which race is disadvantaged. The argument, sometimes made, that the white majority may, consistent with the Constitution, deliberately choose to disadvantage itself was inapposite on the facts of *Croson*. The Court noted that Blacks comprised 50% of the population of Richmond, and that five of the nine City Council seats belonged to Blacks. "The concern that a political majority will more easily act to the disadvantage of a minority based on unwarranted assumptions or incomplete facts would

seem to militate for, not against, the application of heightened judicial scrutiny in this case." *Id.*, at 722.

### D. The Croson Plurality–Part III–B

Part III–B of the plurality opinion, also written by Justice O'Connor, was joined by Chief Justice Rehnquist and Justices White and Kennedy. The plurality found that the factual predicate of the Richmond Plan suffered from the same defects as those found fatal to the plan outlined in *Wygant:*

> Appellant argues that it is attempting to remedy various forms of past discrimination that are alleged to be responsible for the small number of minority businesses in the local contracting industry. Among these the city cites the exclusion of blacks from skilled construction trade unions and training programs. This past discrimination has prevented them "from following the traditional path from laborer to entrepreneur" ... The city also lists a host of nonracial factors which would seem to face a member of any racial group attempting to establish a new business enterprise, such as deficiencies in working capital, inability to meet bonding requirements, unfamiliarity with bidding procedures, and disability caused by an inadequate track record ... It is sheer speculation how many minority firms there would be in Richmond absent past societal discrimination, just as it was sheer speculation how many minority medical students would have been admitted to the medical school at Davis absent past discrimination in educational opportunities. *Defining these sorts of injuries as "identified discrimination" would give local governments license to create a patchwork of racial preferences based on statistical generalizations about any particular field of endeavor.* (emphasis added). *Id.*, 109 S.Ct. at 723–24.

Part III–B listed the predicate facts relied on by the District Court in *Croson*, in finding an acceptable plan in existence in Richmond, and then disabused those "facts" as being a valid basis for a race-based plan. The factors recited and rejected by the Court are as follows:

1. *The ordinance declared itself to be remedial.* The Court said that a mere recitation of a "benign" or legitimate purpose is entitled to little or no weight. "Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice." *Id.*, at 724.

2. *Several proponents of the measure stated their views that there had been past discrimination in the construction industry.* The plurality found the statements in this regard of "little probative value in establishing identified discrimination in the Richmond construction industry." *Id.*, at 724.

3. *Minority businesses received .67% of prime contracts from the city while minorities constituted 50% of the city's population.* The plurality found that reliance on the disparity between the number of prime contracts awarded to minorities and the minority population was misplaced:

> There is no doubt that "[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination" under Title VII. (cite omitted) But it is equally clear that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." (cite omitted) ("[T]his is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded."). *Id.*, at 725–26.

4. *There were very few minority contractors in local and state contractors' associations.* The Court stated that, standing alone, this fact is not probative of any discrimination in the local construction industry. The plurality found numerous explanations for any disparity that might exist. They found that for this factor to be relevant it would have to

be linked to the number of local MBEs eligible for membership. *Id.*, at 723, 726.

5. *In 1977, Congress made a determination that the effects of past discrimination had stifled minority participation in the construction industry nationally.* The plurality said that this finding from *Fullilove* was of extremely limited probative value. The opinion reiterated the parts of Part III–A which addressed the role of state or local government entities in correcting "societal discrimination." The plurality rejected the dissent's suggestion that discrimination may be "shared" from jurisdiction to jurisdiction, stating "[w]e have never approved the extrapolation of discrimination in one jurisdiction from the experience of another." *Id.*, at 727–28.

Justice O'Connor, in pronouncing the plurality opinion, stated in conclusion of Part III–B that:

> In sum, none of the evidence presented by the city points to any identified discrimination in the Richmond construction industry. We, therefore, hold that the city has failed to demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race. To accept Richmond's claim that past societal discrimination alone can serve as the basis for rigid racial preferences would be to open the door to competing claims for "remedial relief" for every disadvantaged group. The dream of a Nation of equal citizens in a society where race is irrelevant to personal opportunity and achievement would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs ...
> The foregoing analysis applies only to the inclusion of blacks within the Richmond set-aside program. There is *absolutely no evidence* of past discrimination against Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons in any aspect of the Richmond construction industry ... The random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry in Richmond, suggests that perhaps the city's purpose

was not in fact to remedy past discrimination. (emphasis in original). *Id.*, at 727–28.

### E. The Croson Plurality–Part IV

Joining Justice O'Connor in Part IV, were Chief Justice Rehnquist and Justices White and Kennedy. On the question of whether or not the Richmond Plan is narrowly tailored to remedy prior discrimination, the plurality finds the assessment almost impossible. The four justices do find that it does not appear that any consideration was given by the City to the use of race-neutral means for increasing MBE participation:

> Many of the barriers to minority participation in the construction industry relied upon by the city to justify a racial classification appear to be race neutral. If MBEs disproportionately lack capital or cannot meet bonding requirements, a race neutral program of city financing for small firms would, *a fortiori*, lead to greater minority participation. *Id.*, at 728.

Secondly, the plurality found that the 30% quota could not be said to be narrowly tailored to any goal except "perhaps outright racial balancing." The goal was based on the unrealistic assumption that minorities would choose a trade "in lockstep proportion to their representation in the local population":

> Under Richmond's scheme, a successful black, Hispanic, or Oriental entrepreneur from anywhere in the country enjoys an absolute preference over other citizens based solely on their race. We think it obvious that such a program is not narrowly tailored to remedy the effects of prior discrimination.

### F. The Croson Plurality–Part V

Justice O'Connor, joined by Chief Justice Rehnquist and Justices White, Kennedy, and Scalia, informs regarding options or opportunities available to a state or local entity in taking action to rectify the effects of "identified discrimination within its jurisdiction." These include: 1) where there is

evidence of systematic exclusion of MBEs, the entity may take action to end the discriminatory exclusion; 2) where there is significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors engaged by the locality or prime contractors, an inference of discriminatory exclusion could arise, and, the entity could act to dismantle the closed business system by taking appropriate action against those who discriminate (in an "extreme" case, a narrowly tailored racial preference "might be necessary"); 3) where there are individual instances of racially motivated refusal to employ minorities, an entity would be justified in penalizing the discriminator and providing "appropriate relief" to the victim; 4) if supported by appropriate statistical proof, evidence of a pattern of individual discriminatory acts may lend support to a determination that broader remedial relief is justified; and 5) in the absence of evidence of discrimination, the entity may employ an "array of race-neutral devices" to increase accessibility to contracting by small entrepreneurs of all races including: simplification of bidding procedures; relaxation of bonding requirements; training and financial aid for disadvantaged entrepreneurs; and prohibition of discrimination in provision of credit or bonding by local suppliers and banks.

This Court acknowledges and agrees with the summary of the *Croson* decision provided by Attorney Sam A. Mackie, "Florida Minority Business Hiring," *The Florida Bar Journal* (Vol. LXIII, No. 6, June 1989):

In summary, then, a minority-business or local-preference hiring ordinance must be founded upon specific and objective evidence concerning:

1. The nature and scope of the discriminatory injury that exists or existed;

2. The historical or antecedent causes of such discrimination;

3. The extent to which the governmental entity contributed to these causes or injuries, either by intentional acts or passive complicity in acts of discrimination by the private sector;

4. The necessity for the response adopted;

5. The duration of the response in relation to the wrong; and

6. The precision with which the response otherwise bore on whatever injury in fact was addressed.

What does all of this mean for the governmental legal practioner, counsel to a minority business enterprise firm, and civil rights/affirmative-action defense and plaintiff's counsel in general?

Even a shallow reading of *Croson* would reveal the following:

1. All affirmative-action programs are now suspect, and there is no longer such a thing as "benign racial classification."

2. Preferences that favor blacks, women, and other minorities violate the civil rights of whites.

3. Racial preferences, if used at all, must be confined to reconciling specific, identifiable discrimination.

4. Federal and private set-aside programs are immune from the *Croson* obligations and guidelines.

5. Competitive bidding is, by definition, nondiscriminatory, and is, therefore, incompatible with MBE requirements, quotas, or goals.

6. If a share of a public works contract is awarded to an MBE firm, the share may *not* be based upon the number of minorities in the government entity's jurisdiction population, but only upon minority firms ready, willing, and able to work in the subcontracting area being targeted. (footnotes omitted).

## G. Justice Stevens Opinion

Justice Stevens concurs in part with the plurality (specifically joining Parts I, III–B, and IV) and concurs in the judgment. Justice Stevens states he does not agree with the premise, that "seemingly underlies the plurality opinion", that a governmental decision that rests on a racial classification is never permissible except as a remedy for a

past wrong. *Croson* (Stevens opinion), at page 730. Justice Stevens emphasizes three aspects of the case which are of particular import to him: 1) the city makes no claim that the public interest in the efficient performance of its construction contracts will be served by granting a preference to minority business enterprises; 2) the litigation involves an attempt by a legislative body, rather than a court, to fashion a remedy for past wrongs; and 3) identification of the characteristics of the advantaged and disadvantaged classes is more constructive to justify disparate treatment than engaging in a debate over the proper standard of review to apply.

### H. Justice Kennedy Opinion

Justice Kennedy joins all but Part II of the opinion authored by Justice O'Connor. In his opinion Justice Kennedy concludes that a "State has the power to eradicate racial discrimination and its effects in both the public and private sectors, and the absolute duty to do so where those wrongs were caused intentionally by the State itself." The opinion further accepts the rule announced by the plurality that "any racial preference must face the most rigorous scrutiny by the courts."

### I. Justice Scalia Opinion

Justice Scalia agrees with much of the O'Connor opinion, including the application of strict scrutiny, but disagrees with the "dicta" suggesting that state and local entities may "in some circumstances discriminate on the basis of race in order (in a broader sense) 'to ameliorate the effects of past discrimination.' " Justice Scalia states that, at least as to state or local action, "only a social emergency rising to the level of imminent danger to life and limb—for example, a prison race riot, requiring temporary segregation of inmates, (cite omitted)—can justify an exception to the principle embodied in the Fourteenth Amendment that '[o]ur Constitution is color-blind, and neither knows or tolerates classes among citizens.' " *Croson* (Scalia opinion), at page 735. Only where a state is acting to undo the effects of its own past discrimi-

natory practices, does Justice Scalia find it acceptable for the State to act by race. *Id.*, at 737.

### J. Dissents

Justice Marshall issued a dissenting opinion, joined by Justices Brennan and Blackmun. This dissent finds the plurality opinion to be a deliberate and giant step backwards in affirmative action jurisprudence. *Croson* (Marshall opinion), at page 740. "So long as one views Richmond's local evidence of discrimination against the backdrop of systematic nationwide racial discrimination which Congress had so painstakingly identified in this very industry, this case is readily resolved." *Id.*, at 743.

The majority today sounds a full-scale retreat from the Court's longstanding solicitude to race-conscious remedial efforts "directed toward deliverance of the century-old promise of equality of economic opportunity." (cite omitted) The new and restrictive tests it applies scuttle one city's efforts to surmount its discriminatory past, and imperil those of dozens more localities. I, however, profoundly disagree with the cramped vision of the Equal Protection Clause which the majority offers today and with its application of that vision to Richmond, Virginia's, laudable set-aside plan. The battle against pernicious racial discrimination or its effects is nowhere near won. *Id.*, at 757.

Justice Blackmun writes a second dissenting opinion, joined by Justice Brennan. Justice Blackmun also finds the majority opinion to be regressive.

This Court includes its detailed analysis of the respective Justice's opinions in *Croson* as a further guide to the litigants herein, as well as a contemporary roadmap for future travelers along this newly constructed pathway. The Court would also note at this point that it has taken a stand to award the female sex equal footing with other "minorities" by capitalizing the word "Women" where ever it appears in this order.

In conclusion, the Court reiterates its previous statements and concludes that

Plaintiffs' motion for preliminary injunction is well-taken. Accordingly, it is

ORDERED AND ADJUDGED

1. That the Plaintiffs' motion for preliminary injunction be GRANTED. The Defendants and their representatives, agents and employees be ENJOINED from enforcing, pursuing, or taking any further action to implement Resolution R88–1073, and concomitant Administrative Orders, or any other regulation or policy which requires or permits the allocation of Hillsborough County construction contracts, from the date of the filing of this cause of action, on a system based in whole or in part on race, color, national origin, or sex, until such time as this case is heard on the merits and until further order of this Court, and

2. This preliminary injunction is conditioned upon the Plaintiffs posting a bond in the sum of $5,000.00, conditioned that Plaintiffs shall pay to Defendants such damages as they may sustain if it is determined that this injunction was wrongfully issued.

DONE and ORDERED.

EXHIBIT A
HILLSBOROUGH COUNTY
TOTAL DOLLARS SPENT BY COUNTY WITH
MINORITY/FEMALE BUSINESSES

| MINORITY/FEMALE CONTRACTORS | FY 1979–1980 | *PERCENTAGE |
|---|---|---|
| Black Contractors | $ 7,702 | .03% |
| Hispanic Contractors | 617,230 | 2.24% |
| Female Contractors | — | — |
| Total Minority Contractors | $624,932 | 2.3% |

TOTAL DOLLARS SPENT BY COUNTY OVERALL—FY 1979–80:   $27,591,738

| | FY 1980–81 | |
|---|---|---|
| Black Contractors | $ 11,704 | .03% |
| Hispanic Contractors | 672,982 | 1.94% |
| Female Contractors | 84,713 | .24% |
| Total Minority Contractors | $769,399 | 2.2% |

TOTAL DOLLARS SPENT BY COUNTY OVERALL—FY 1980–81: $34,763,999

*Percentage is figured against total dollars spent by Hillsborough County for procurement of goods, services and construction. This comparison data did not include definite dollar amounts spent with White Contractors, due to information as requested not provided. (Defs. Ex. 13).

EXHIBIT B

Total bids awarded ...................................................663
Total dollar amount awarded .......................................$2,942,919.27*
Total bids awarded minority firms ...........................................42
Total dollar amount awarded minorities .............................$   44,917.25

*A single bid was awarded for $2,257,327.10, thereby reducing the dollar amount for the remaining bids to $685,592.10.

Percentage of bids awarded to minorities ......................................6.3%
Percentage of dollar amount awarded to minorities (Total dollar)................1.5%

Percentage of dollar amount awarded to minorities (less large $2 million bid)....6.5%

---

## EXHIBIT C

### STATISTICAL REPORT ON MINORITY/FEMALE BUSINESS PARTICIPATION IN HILLSBOROUGH COUNTY PROCUREMENT

County Purchases as of October 31, 1982 to July 31, 1983*

Total Purchase Orders Awarded: 11,177

Total Dollars Spent for Purchases: $24,890,246.96

Distribution of Purchases Awarded by

| Race/Ethnic Characteristics | Number of Purchase Orders | Percentage of Purchases |
|---|---|---|
| Black | 101 | .90% |
| Hispanic | 578 | 5.17% |
| Women | 190 | 1.70% |
| **Other Minority | 13 | .12% |
| Non–Minority | 10,295 | 92.11% |

Total Minority Participation in Purchases: 7.89%

Distribution of Dollars Spent with Minorities by

| Race/Ethnic Characteristics | Dollar Amount | |
|---|---|---|
| Black | $ 27,899.81 | .11% |
| Hispanic | 177,248.60 | .71% |
| Women | 90,675.03 | .36% |
| **Other Minority | 10,457.50 | .04% |
| Non–Minority | 24,584,038.33 | 98.80% |

Total Dollars Spent with Minority Business: 1.22%

*Prior to October 31, 1982, data on MBE participation was not available by race and sex.

**Other Minority–Asian or Pacific Islander, American Indian, etc.

Statistical Source:
    Statistical data obtained from monitoring logs developed for Purchasing to monitor MBE and WBE participation on continuous basis.

---

## EXHIBIT D
### Table A

| POPULATION | | 1980 Census |
|---|---|---|
| Percentage | | |
| Total Hillsborough County | 646,960 | |
| Total Minorities | 164,584 | 25.5% |
| NUMBER OF BUSINESSES | 1983 Data | |
| Total Hillsborough County * | 14,417 | |
| Total Minority | 1,378 | 10.0% |
| Minority Businesses (other source) ** | 700 | 4.9% |
| NUMBER OF CONSTRUCTION CONTRACTORS ONLY | | |
| Total Contractors County | 2,378 | |
| Total MBE | 281 | 12.0% |

*Data taken from records on file in the Division of Operations and Purchasing Department.

**Data taken from MBE Directory by the Office of Community Relations.