Alan A. **PEIGHTAL,**
Plaintiff–Appellant,

v.

**METROPOLITAN DADE COUNTY,** Metropolitan Fire Department of Dade County, Defendants–Appellees.

No. 88–5496.

United States Court of Appeals,
Eleventh Circuit.

Sept. 4, 1991.

Alexander Kapetanakis, Miami, Fla., for plaintiff-appellant.

John McInnis, Dade County Attorney's Office, Miami, Fla., for defendants-appellees.

Before TJOFLAT, Chief Judge, JOHNSON, Circuit Judge, and BROWN *, Senior Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge:

*Foreword*

As the Court is divided on the question of whether *Croson* requires remand to the District Court to determine whether there is a violation of the Equal Protection Clause, this opinion [1] is constructed sharply to delineate the difference.

The Court is together on Parts I, II and III. In Part IV, the Court parts company. Judge Brown, in what is essentially his dissenting opinion, articulates why he is of the opinion that a remand on Equal Protection is not necessary and why, if *Croson* applies to determination of Title VII, *Cro-*

---

\* Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. For historical precedent for this appellate opinion procedure see *Stanga v. McCormick Shipping Corp.,* 268 F.2d 544, 546, 55 (5th Cir. 1959); *United States v. DeWitt,* 265 F.2d 393, 394, 401 (5th Cir.1959); *Canal Insurance Co. v. Dougherty,* 247 F.2d 508, 509, 513 (5th Cir.1957). *Cf. Louisiana Power & Light Co. v. FPC,* 483 F.2d 623, 624, 632 (5th Cir.1973); *Grigsby v. Coastal*

*Marine Service of Texas, Inc.,* 412 F.2d 1011, 1023 (5th Cir.1969); *see also, Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224, 239 n. 33 (5th Cir.1976); *Wallace v. House,* 515 F.2d 619, 637 (5th Cir.1975); *EEOC v. Internat'l. Longshoremen's Ass'n.,* 511 F.2d 273 (5th Cir.1975); *United States v. Register,* 496 F.2d 1072, 1076 n. 1 (5th Cir.1974); and *Nathaniel Shipping Inc. v. General Electric,* 920 F.2d 1256 (5th Cir.1991).

*son* is fully met. Chief Judge Tjoflat and Judge Johnson do not concur in Part IV, believing as they do that determining whether under *Croson* the Metro Dade plan violates the Equal Protection Clause, should be remanded to the District Court for its consideration in light of *Croson.* Chief Judge Tjoflat, concurring with Judge Johnson, writes additionally.

Judge Brown and Judge Johnson agree on Part V that the plan is not invalid under Title VII. Chief Judge Tjoflat dissents separately on this part. The result is that the judgment of the District Court on Title VII is affirmed. The question whether under *Croson* the plan violates the Equal Protection Clause is remanded.

### Introduction

Alan Peightal (Peightal) brings an individual (non-class action) reverse discrimination claim against appellee Metropolitan Dade County (Metro Dade) because the Dade County Fire Department (Fire Department or Department) hired minorities who scored lower than Peightal on the applicant exam, but did not hire Peightal. When Peightal applied for a job as a firefighter, the Fire Department was hiring pursuant to an affirmative action plan (Plan) which sought to redress a statistical imbalance between the percentage of mi-

norities[2] in the Department and the percentage of minorities in the general population. The district court upheld the Plan against Peightal's claim that it violated Title VII and the Equal Protection Clause of the United States Constitution. We affirm in part; vacate and remand in part.

### I.

### *Facts and Proceedings Below*

On October 18, 1983, Peightal, a white male, applied for a position as a firefighter with the Fire Department. Peightal took the firefighter examination in October of 1983 along with 3,300 others. Peightal's score of 98.25 earned him a rank of 28 out of 2,188 persons who passed the test.[3]

As the trial court found, when Peightal applied in October 1983, the Fire Department was hiring pursuant to a minority preference program that called for the selection of female, black and Hispanic applicants in accordance with certain goals established for the purpose of increasing the representation of these groups. Before adopting the Plan, Metro Dade[4] conducted an analysis of the Fire Department's work force which revealed that in 1965 the Department employed 121 firefighters, all but one of whom were white males, compared

---

**2.** Throughout this opinion, we use the term "minorities" to include women.

**3.** Both the appellant's brief and the district court state that Peightal's test score placed him in the "28th percentile" of applicants. This is misleading, but ironically it is misleading disadvantageously to Peightal. In fact, there were only 27 persons who scored higher than Peightal on the examination. The normal understanding of a 28th "percentile" ranking would have meant approximately 613 people did better than Peightal (28% of 2,188). Obviously, this is a significant difference.

**4.** Metropolitan Dade County is a sovereign entity comprehending specific powers as to the 26 municipalities and the unincorporated area within the geographical boundaries of the county. The Florida Constitution provides:

The electors of Dade County, Florida, are granted power to adopt, revise, and amend from time to time a home rule charter of government for Dade County, Florida, under which the Board of County Commissioners of Dade County shall be the governing body.

*See Constitution, State of Florida, Home Rule Amendment Relating to Dade County,* Art. VII, Sec. 11 (adopted Nov. 6, 1956)

The *Home Rule Charter for Metropolitan Dade County,* (Official Records Book 182, p. 667, Public Records of Dade County, Florida) (adopted May 21, 1957), provides that the "Board of County Commissioners shall be the legislative and the governing body of the county and shall have the power to carry on a central metropolitan government." *Id.,* Art. I, Sec. 1.01. This power includes, (as a partial list), the power to (i) provide a uniform system for fire and police protection, (ii) provide and regulate roads, bridges, tunnels and related facilities, (iii) provide and operate air, water, rail and bus terminals, port facilities, and public transportation systems; (iv) license and regulate passenger vehicles for hire operating in the county; (v) levy and collect taxes and special assessments; and (vi) establish, merge and abolish special purpose districts within which may be provided fire protection, among other services. *Id.*

to a general population that was 69% white, 15% black, 16% Hispanic and 52% female. By 1975, the Fire Department had grown to 499 firefighters, of whom 89% were white, 8% were black, 3% were Hispanic and none was female, compared to a general population that was 52% white, 16% black, 32% Hispanic and over 50% female. By 1983, when the Plan at issue herein was implemented, the number of firefighters in the Department had increased to 921, of whom 74.9% were white, 11.8% were black, 13.8% were Hispanic and 1.3% were female, compared to a general population that was 47% white, 17.3% black, 35.8% Hispanic and over 50% female.[5]

The district court found that once the applicants took the examination, their respective scores were grouped and ranked by the applicants' particular classification as defined by the Fire Department pursuant to the Plan. The following six categories were used: (i) Black Males, (ii) Black Females, (iii) White Females, (iv) Hispanic Males, (v) Hispanic Females, and (vi) White Males. All applicants were scored and ranked only against those other members of the category. For example, a Black Male's test score would be ranked only against the score of another member of the class of Black Males taking the examination; the score of a White Male applicant such as Peightal would not be ranked against the score of any non-"White Male" applicant.

The district court found that although the position of firefighter is described as "specialized work in the protection of life and property," the position is nevertheless an "entry-level" one, as "there are no specialized skills per se which must be possessed in order to obtain the position." [6] Accordingly, the trial court ruled that "a comparison between the Fire Department's work force and the labor market is appropriate." [7]

The stated long-term goal of the Department's Plan was "to attain parity [between the Department's work force and] the population." [8] The Plan made a distinction between two kinds of employees for the purpose of determining hiring goals. For professional and administrative positions, Metro Dade sought to achieve the same per-

---

5. The percentage of Hispanics has increased markedly since 1965. As the percentage of Hispanics has risen, the percentage of whites has fallen.

6. To become a firefighter, candidates must:
   possess a high school diploma or its equivalent
   possess a driver's license and have the ability to obtain a chauffeur's license
   be at least 18 years old
   pass a physical capabilities test
   pass a medical examination
   pass a personal interview
   have corrected vision in both eyes of at least 20/40

7. The trial court implicitly equates the labor force with the general population. As will later become clear, the Supreme Court allows this equivalency to be assumed for unskilled positions.

8. Phrasing the goal of the Plan in terms of "racial parity" treads on thin constitutional ice. See Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 494, 106 S.Ct. 3019, 3059, 92 L.Ed.2d 344, 399 (1986) ("[I]t is completely unrealistic to assume that individuals of one race will gravitate with mathematical exactitude to each employer or union absent unlawful discrimination"), (O'Connor, J., concurring in part and dissenting in part), quoted with approval in City of Richmond v. J.A. Croson Co., 488 U.S. 469, 508, 109 S.Ct. 706, 729, 102 L.Ed.2d 854, 891 (1989) (majority opinion); see also Shurberg Broadcasting of Hartford, Inc. v. FCC, 876 F.2d 902, 912 (D.C.Cir.1989) (Silberman, J., concurring) ("Governmentally-imposed minority preferences are constitutionally permissible under certain limited circumstances, but they may not be based on the desirability per se of achieving racial balance or proportional representation of minorities in selected institutions"), reversed sub nom., Metro Broadcasting, Inc. v. FCC, —— U.S. ——, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990).

As will be discussed more fully, infra, voluntary affirmative action plans must seek to remedy past discrimination to survive constitutional challenge under the strict scrutiny standard. Redressing the significant underrepresentation of minorities in the place of employment is a legitimate goal for an affirmative action plan, as we shall see. Thus, while the remedial action taken by the Metro Dade fire department may, for practical purposes, be initially identical whether the goal is framed as "seeking racial parity" or "redressing prior discrimination," it would behoove those employers drafting affirmative action plans to use language which mirrors the constitutional requirements.

centage of female and minority employees as existed in the available qualified labor force.[9] For the other category of employees, which included Protective Services (Firefighters), Para–Professionals, Office Clerical, Skilled Craftsmen and Service Maintenance, the Plan called for the usage of a "70% rule." According to the Metro Dade "Affirmative Action Policy and Statement: Goals and Timetables:"

> [e]ssentially what the 70% rule says is that a *significant disparity* between minority representation in the service population, in our case, that is Metro Dade's departments and divisions, may be deemed to exist if the percentage of a particular minority group in the department/agency is not at least 70% of the percentage of that minority in the service population. (Our emphasis.)

Applying the 70% rule to Metro Dade population statistics, the Fire Department determined that its hiring goals for 1983 should include 44 whites, 23 blacks, 37 Hispanics, and 23 females.[10] As a result of the Department's hiring from the 1983 examination, the following recruits were hired from 1983 to 1985: (i) 23 White Males, (ii) 12 White Females, (iii) 18 Black Males, (iv) 5 Black Females, (v) 24 Hispanic Males, and (vi) 4 Hispanic Females. The total figure hired was 86 persons; and 51 of these scored lower than Peightal on the 1983 examination. Nevertheless, Peightal was not hired.

In March of 1986, Peightal found out that he had been taken off the "stand by" list of applicants and had not been hired due to the Plan. Peightal filed an Equal Employment Opportunity Commission (EEOC) Complaint alleging racial discrimination. On August 12, 1986, the EEOC denied Peightal's charge and found that Metro Dade's actions were done in accordance with an affirmative action plan but issued Peightal a "right to sue" letter which permitted him to file this present suit.

On November 21, 1986, Peightal filed a complaint under 42 U.S.C. § 1983[11] and Title VII of the Civil Rights Act of 1964 against Dade County and the Department. Peightal sought injunctive relief against Dade County for its preferential hiring treatment of minorities, and back wages

---

9. For example, in 1983 there were 65,935 residents of Dade County considered by the profession to be managers or administrators. White Females were 8,294 for a 14.6% total, Black Males 1,399 for a 2.4% total. Goals established for each Dade County department and agency would be based upon the minority/female representation in the labor force. Thus, the Metro Dade "Affirmative Action Policy Statement: Goals and Timetables" brochure stated: "14.6% for White females, 2.4% for Black males should be the representation of these two groups in your department in the official administrative position. We do not address the constitutionality of the Plan as it relates to professional and administrative positions.

10. In detailing goals and population figures, sometimes the Fire Department separates each of the three racial/ethnic categories (blacks, Hispanics, whites), into two gender categories, for a total of six. At other times, males and females within a racial/ethnic category are lumped together, and then overall percentages of males and females are provided.

In 1983, the Plan listed the following goals for its firefighter population. There were 754,443 white persons in Dade County in 1983, which represents 47% of the population. Accordingly, the Fire Department sought to achieve 33% white firefighters (70% of 47%). For blacks, who comprised 17% of the population, (280,434 total), the sought for figure was 12.1%. Hispanics made up 36% of the population of Dade County, (580,994 total), so the Fire Department wanted to achieve 25% Hispanic firefighters. Finally, the Fire Department set a goal of 37.1% female fighters, because women comprised 53% of the total population.

11. Section 1983 provides in relevant part:

> Every person, who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit inequity or other proper proceeding for redress. * * *

42 U.S.C. § 1983 (1988). Peightal alleged the violation of both Title VII and the equal protection clause as the predicate for his claim for recovery under § 1983. Because § 1983 secures no substantive rights of its own, our affirmance of Peightal's Title VII and remand of his constitutional claims are dispositive also of his action under § 1983.

from the time period which he should have been hired had Dade County's hiring practices not been in effect.[12]

On December 19, 1986, Metro Dade[13] filed its answer alleging its dependence and reliance upon the Plan and offered the specific defense that the denial to Peightal of any position of employment was due to its "legitimate affirmative action program," and that Dade County was exempt from liability on the ground that it adopted the EEOC regulations for the challenged Plan. Metro Dade also asserted that 42 U.S.C. § 1983 was not a valid remedy when the Title VII remedy was available and that Peightal had not timely filed his claim under Title VII for discrimination.

A non-jury trial was held in January 1988 with the issue of damages to be determined at a later date after the liability issues were determined.

In April 1988, Peightal appealed the judgment in favor of Metro Dade.

## II.

### The Constitutionality of Government-Sponsored Minority Preference Programs

On January 23, 1989, the Supreme Court issued its landmark *Croson* decision in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) on the constitutionality of government-sponsored minority preference programs.[14] Since the district court handed down the opinion in the case *sub judice* on April 25, 1988, it was obviously unable to give detailed consideration to *Croson*. On appeal, however, it is our duty to apply the law as it exists when we deliver our opinion, even if it has changed since the time of a lower court decision.[15] *Thorpe v. Housing Auth. of City of Durham*, 393 U.S. 268, 281, 89 S.Ct. 518, 526, 21 L.Ed.2d 474, 483 (1969). *See also Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 486 n. 16, 101 S.Ct. 2870, 2879 n. 16, 69 L.Ed.2d 784, 796 (1981). Since, before *Croson*, a majority of the Supreme Court had never joined in one opinion[16] on the constitutionality of

---

**12.** Peightal initially had also sued under the "Vietnam Preference Act" and "Vietnam Era Veterans' Readjustment Assistance Act of 1974," but dropped such claim for relief before trial and tried the case solely on the issues of discrimination under 42 U.S.C. § 1983, Title VII, and the Fourteenth Amendment to the United States Constitution.

**13.** The "Metropolitan Fire Department of Dade County," did not file an answer, although it was an originally named defendant, because the legal entity responsible for fire service in the county is Dade County. Accordingly, on appeal, the sole appellee in this case is Metro Dade.

**14.** The significance of *Croson* is revealed by the gathering of thirty of the nation's most prominent constitutional scholars shortly after the opinion was made public for a conference in Boston to discuss the import of the decision and to issue a statement in response. *See Constitutional Scholars' Statement on Affirmative Action After City of Richmond v. J.A. Croson Co.*, 98 Yale L.J. 1711 (1989). Challenging what he regarded as "spin control" by these scholars and law school deans, Charles Fried, then Solicitor General, parried with his own comments, and asserted that their statement "adopts the tone at once of Chicken Little and Dr. Pangloss: Something terrible has happened, but it's not so bad after all." Fried, *Affirmative Action after City of Richmond v. J.A. Croson Co.: A Response to the Scholars' Statement*, 99 Yale L.J. 155 (1989). Fried's analysis provoked a counterattack by the

thirty scholars. *Scholar's Reply to Professor Fried*, 99 Yale L.J. 163 (1989).

There should be little doubt that *Croson* is indeed a weighty decision. The most extensive response to *Croson* so far, Rosenfeld, *Decoding Richmond: Affirmative Action and the Elusive Meaning of Constitutional Equality*, 87 Mich.L. Rev. 1729 (1989), asserts that "a majority on the Court for the first time has settled on a single standard—the strict scrutiny test," *id.* at 1731, and concludes that the case is a "turning point," *id.*, and "of considerable importance." *Id.* at 1793.

**15.** The appellate briefs also predate *Croson*, since the case was heard on appeal less than a month after *Croson* was issued.

**16.** *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (equal protection reverse discrimination claim brought by white school teachers with greater seniority who were laid off pursuant to a collective bargaining agreement to protect the jobs of minority teachers with less seniority in order to preserve gains in minority teacher recruitment); *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (constitutional challenge to a federal statute enacted by Congress pursuant to its authority under the commerce clause, § 5 of the Fourteenth Amendment, and Congress's taxing and spending power; the statute set aside 10% of funds for minority business enterprises); *Regents of the Univ. of Cal. v.*

government-sponsored voluntary affirmative action programs,[17] the lower federal courts have had to struggle[18] to extract the holding that commanded a majority in each case to arrive at the governing principles and limitations. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 266 (1977).

In *Croson,* a majority of the Court finally agreed that the constitutionality of a state or local public minority preference program must satisfy a strict scrutiny standard. Because of the complexity of the issues involved, the uncertainty surrounding some of the precedential authority, and the relatively untested nature of

the recent—and only majority—Supreme Court decision on the subject, it will be helpful to discuss in some detail the facts and holdings of *Croson.*[19]

## III.

### *City of Richmond v. J.A. Croson Co.*

There are six separate opinions in *Croson.* Justice O'Connor authored the plurality opinion, and was joined to form a majority in Parts I, III–B, and IV of her opinion. Justices Stevens, Kennedy, and Scalia wrote separate concurring opinions, and Marshall and Blackmun filed dissenting opinions.[20] Because Parts I, III–B and IV

*Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (equal protection reverse discrimination challenge to a state medical school's admissions policy that reserved 16 out of 100 seats exclusively for minority group members). These three decisions produced 17 different opinions.

**17.** In addition to these three decisions, n. 16, *supra,* on the *constitutionality of voluntary* affirmative action programs, the Supreme Court had issued six major decisions on the legitimacy of affirmative action plans in cases involving Title VII or court-ordered programs. For ease of reference, each of these six cases is fully cited below, followed by a brief description of its facts. *Johnson v. Transportation Agency, Santa Clara County, Cal,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (Title VII reverse discrimination claim brought by a male who was passed over for a promotion to a road dispatcher's job in favor of an arguably less qualified woman); *United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (equal protection reverse discrimination claim brought by white state troopers challenging a judicially-imposed 50/50 promotion plan implemented following the district court's finding of egregious discrimination; the quota was actually used only once); *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (Title VII reverse discrimination claim by white firefighters challenging a consent judgment entered into by the city and a black firefighter association which called for promotion quotas); *Sheet Metal Workers' Int'l Ass'n v. EEOC, supra,* (Title VII reverse discrimination claim brought by a union objecting to a judicially-imposed 29% membership goal, following the district court's finding of persistent, egregious discrimination); *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (challenge by a fire department and firefighters' union to a district court order modifying, over their objection, a consent judgment in order to

prevent the layoff of recently hired minority firefighters; the minority firefighters were originally hired to settle a Title VII action alleging discriminatory hiring and promotion practices); *United Steelworkers of Am. v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (Title VII reverse discrimination claim against a private employer challenging the establishment of a training program that limited its enrollment to 50 percent white trainees, reserving 50 percent of its enrollment for black trainees).

**18.** One commentator described the opinions in these nine cases, nn. 16 and 17, as follows:

The opinions in these nine [Supreme Court] cases are lengthy, incohesive, contradictory, and ambiguous. They occupy over five hundred fifty-four pages in the official reporters and consist of forty-six majority, plurality, concurring, and dissenting opinions. Even within a single case, it is often impossible to discern the Court's holding because not every Justice in the majority will endorse the entire majority opinion. Often there is no majority opinion, only a plurality opinion.

Daly, *Some Runs, Some Hits, Some Errors— Keeping Score in the Affirmative Action Ballpark from Weber to Johnson,* 30 Boston College Law Review 1, 5 (1988).

**19.** For a good discussion of the principles governing the constitutionality of voluntary affirmative action programs, *see Shurberg Broadcasting,* 876 F.2d at 910–12 (Silberman, J., concurring), which gleans some "general propositions" from the four relevant cases, *Croson, Bakke, Fullilove,* and *Wygant.*

**20.** An exceptionally thorough discussion of the *Croson* opinion appears in *Cone Corp. v. Hillsborough County,* 723 F.Supp. 669 (M.D.Fla. 1989), *rev'd,* 908 F.2d 908 (11th Cir.), *cert. denied,* ― U.S. ――, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990), which breaks the opinion down into its various sections for analysis. The careful

of Justice O'Connor's opinion form the binding precedential core of *Croson*, we will devote our attention to that portion of the decision. Technically, we are not bound by those opinions (or portions of opinions) of the Supreme Court that do not carry a majority of Justices, although such opinions are obviously of persuasive quality. *See Powers v. Alabama Dep't of Educ.*, 854 F.2d 1285, 1292 n. 11 (11th Cir.1988), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989); *Coral Const. Co. v. King County*, 729 F.Supp. 734, 738 (W.D.Wash.1989).

In the spring of 1983, the Richmond, Virginia, City Council adopted a Minority Business Utilization Plan (the Richmond Plan). The Richmond Plan required prime contractors to whom the city awarded construction contracts to subcontract at least 30% of the dollar amount of the contract to one or more Minority Business Enterprises (MBEs). The 30% set-aside did not apply to city contracts awarded to minority-owned prime contractors.

Under the Richmond Plan, an MBE was defined as a business "at least fifty-one (51) percent of which is owned and controlled ... by minority group members." *Croson*, 488 U.S. at 478, 109 S.Ct. at 713, 102 L.Ed.2d at 871 (O'Connor, J., opinion). Minority group members were defined by the City Council as "[c]itizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts." *Id.* There was no geographic limit to the Richmond Plan. A minority-owned business from anywhere in the United States could make use of the 30% set-aside. The Richmond Plan declared itself "remedial" in nature, and was "for the purpose of promoting wider participation by minority business enterprises in the construction of public projects." *Id.*

The Richmond Plan included provisions for waiver of the 30% set-aside. The Director of Richmond's Department of General Services promulgated rules allowing waiver in situations where a prime contractor proved to the satisfaction of the Director that the requirements of the Richmond Plan could not be achieved. *Id.*

After a public hearing at which five citizens spoke against the Richmond Plan, and two voiced support, the Richmond City Council adopted the Richmond Plan. Proponents of the set-aside provision relied on the following: (i) a study which indicated that while the general population of Richmond was 50% black, only 0.67% of the city's prime construction contracts had been awarded to minority businesses in the 5–year period from 1978 to 1983; (ii) a variety of contractors' associations had virtually no minority businesses within their membership; (iii) one of the Richmond councilpersons advocating the Richmond Plan asserted that "race discrimination and exclusion on the basis of race is widespread" in the local and national construction industries. In addition, the district court in *Croson* found that (iv) the ordinance declares itself to be remedial, and (v) in 1977, Congress made a determination that the effects of past discrimination had stifled minority participation in the construction industry nationally. There was no direct evidence of race discrimination by the City of Richmond in the letting of contracts or any evidence that the city's prime contractors had discriminated against minority-owned subcontractors. *Id.*

Croson was a mechanical plumbing and heating contractor that submitted the only bid for the installation of urinals and water closets in the city jail. After Croson failed to satisfy the 30% set-aside requirement, and the city denied its waiver request, the city decided to rebid the project. Croson

reader, however, will note the unfortunate mistakes made in *Cone* describing which Justices joined in the various opinions and sections. For example, *Cone* asserts that "Part III–B of the plurality opinion, also written by Justice O'Connor, was joined by Chief Justice Rehnquist and Justices White and Kennedy." 723 F.Supp. at 682. In point of (significant) fact, however, this part of the opinion forms a majority, not a plurality, and is joined by Chief Justice Rehn-

quist and Justices White, Stevens and Kennedy. *See* Garner, *A Dictionary of Modern Legal Usage* (Oxford Univ. Press: 1985) (a "plurality opinion" is defined as "an appellate opinion without enough judges' votes to constitute a majority, but having received the greatest number of votes of any of the opinions filed"); *see Croson*, 488 U.S. at 477, 109 S.Ct. at 712, 102 L.Ed.2d at 871.

then brought an action under 42 U.S.C. § 1983 in the Federal District Court for the Eastern District of Virginia, arguing that the Richmond ordinance was unconstitutional on its face and as applied in this case.[21] The district court upheld the Richmond Plan and a divided panel of the Fourth Circuit Court of Appeals affirmed. *Croson v. City of Richmond Croson I*, 779 F.2d 181 (4th Cir.1985). The Supreme Court vacated the opinion of the Fourth Circuit, and remanded the case for further consideration in light of *Wygant*. On remand, a divided panel of the Court of Appeals struck down the Richmond Plan as violating both prongs of strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment,[22] *J.A. Croson Co. v. Richmond*, 822 F.2d 1355 (4th Cir.1987) (*Croson II*), and the Supreme Court affirmed. 488 U.S. at 486, 109 S.Ct. at 717, 102 L.Ed.2d at 877.

### The Croson Majority (Parts I, III–B and IV)

In Parts I, III–B and IV of her opinion, Justice O'Connor was joined by the Chief Justice, and Justices White, Stevens, and Kennedy. The Court found that the factual predicate of the Richmond Plan suffered from the same defects as those found fatal to the plan in *Wygant:*

> Appellant argues that it is attempting to remedy various forms of past discrimination that are alleged to be responsible for the small number of minority businesses in the local contracting industry.... While there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify the use of an unyielding racial quota.... [A]n amor-

phous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota.

*Croson*, 488 U.S. at 498, 109 S.Ct. at 723–24, 102 L.Ed.2d at 885. The Court went on to discuss the five predicate "facts" relied upon by the district court, (see five facts listed *supra*), and determined that:

> None of these "findings," singly or together, provide the city of Richmond with a "strong basis in evidence for its conclusion that remedial action was necessary." *Wygant*, 476 U.S. 267, 277 [106 S.Ct. 1842, 1849] (plurality opinion). There is nothing approaching a prima facie case of a constitutional or statutory violation by *anyone* in the Richmond construction industry. *Id.* at 274–75 [106 S.Ct. at 1847]; see also *id.* at 293 [106 S.Ct. at 1857] (O'Connor, J., concurring.)

*Id.* The Court discussed separately the defects in each of the five "facts," and concluded that the 30% quota could not "in any realistic sense be tied to any injury suffered by anyone." *Id.* at 499, 109 S.Ct. at 724, 102 L.Ed.2d at 885. For our purposes, the Court's discussion of the statistical disparity between the number of prime contracts awarded to minority firms and the minority population of the City of Richmond (fact (i), *supra*), is particularly relevant:

> Reliance on the disparity between the number of prime contracts awarded to minority firms and the minority population of the city of Richmond is similarly misplaced. There is no doubt that "[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination" under Title VII. *Hazelwood School Dist. v.*

---

**21.** See *Croson* for a fuller explication of the facts of that case, and of the various pieces of evidence offered in opposition to the Richmond Plan.

**22.** When private employers implement voluntary affirmative action plans, they are subject to the requirements of Title VII. Where the employer is a public body, however, it must also adhere to the requirements of the Constitution. The Equal Protection Clause of the Fourteenth

Amendment states, in pertinent part: "No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has held that the due process clause of the fifth amendment applies in an identical manner to the federal government. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

*United States,* 433 U.S. 299, 307–308 [97 S.Ct. 2736, 2741, 53 L.Ed.2d 768] (1977). But it is equally clear that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Id.* at 308, n. 13 [97 S.Ct. at 2742, n. 13]. *See also Mayor v. Educational Equality League,* 415 U.S. 605, 620 [94 S.Ct. 1323, 1333, 39 L.Ed.2d 630] (1974) ("[T]his is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded").

In the employment context, we have recognized that for certain entry level positions requiring minimal training, statistical comparisons of the racial composition of an employer's workforce to the racial composition of the relevant population may be probative of a pattern of discrimination. *See Teamsters v. United States,* 431 U.S. 324, 337–38 [97 S.Ct. 1843, 1855–56, 52 L.Ed.2d 396] (1977) (statistical comparison between minority truck drivers and relevant population probative of discriminatory exclusion). But where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task. *See Hazelwood, supra,* [433 U.S.] at 308 [97 S.Ct. at 2742]; *Johnson v. Transportation Agency,* 480 U.S. 616, 651–652 [107 S.Ct. 1442, 1462, 94 L.Ed.2d 615] (1987) (O'Connor, J., concurring.)

After discussing the weaknesses in the five predicate "facts," the Court went on to impugn the "gross overinclusiveness" of the Richmond Plan, which included Spanish-speaking, Oriental, Indian, Eskimo, and Aleut persons as minorities qualified for the 30% MBE preference. The total absence of evidence presented of past discrimination against any of these groups fanned the flames of doubt burning in the Court that "the city's purpose was not in fact to remedy past discrimination." The Court questioned whether the Richmond Plan was "narrowly tailored" to compensate black contractors for past discrimination, since they are forced to share this "remedial relief" with "an Aleut citizen who moves to Richmond tomorrow." *Id.* at 506, 109 S.Ct. at 728, 102 L.Ed.2d at 890.

In addition, the Court found that the Richmond Plan was not narrowly tailored to remedy prior discrimination because the Richmond City Council did not consider the use of "race-neutral means to increase minority business participation in city contracting." *Id.* (*citing Paradise,* 480 U.S. at 171, 107 S.Ct. at 1066, 94 L.Ed.2d at 223 ("In determining whether race-conscious remedies are appropriate, we look to several factors, including the efficacy of alternative remedies")). Since the City of Richmond relied upon alleged race-neutral *barriers* to minority participation in the construction industry, e.g., they claimed that MBEs disproportionately lacked capital and could not meet bonding requirements, then "a race-neutral program of city financing for small firms would, *a fortiori,* lead to greater minority participation." [23]

## IV.

### Application

This part is the separate opinion of Judge Brown in support of his conviction that

---

**23.** Pre-*Croson* cases of the Eleventh Circuit afford little help. *See Mann v. City of Albany, Georgia,* 883 F.2d 999 (11th Cir.1989); *Howard v. McLucas,* 871 F.2d 1000 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989); *H.K. Porter Co., Inc. v. Metropolitan Dade County,* 825 F.2d 324 (11th Cir.1987), *vacated,* 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989).

Post-*Croson* cases are few. *S.J. Groves & Sons Co. v. Fulton County U.S. Department of Transportation,* 920 F.2d 752 (11th Cir.1991)

concludes that the *Croson* strict scrutiny standard is lessened by *Metro Broadcasting, Inc. v. FCC,* —— U.S. ——, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990). *See also Cone Corp. v. Florida Department of Highways,* 921 F.2d 1190 (11th Cir. 1991) (*Croson* not determinative, dismissed for lack of standing).

*Cone Corp. v. Hillsborough County,* 908 F.2d 908 (11th Cir.1990), Johnson, J., is highly significant, reversing the district court's declaration that *Croson* required a finding of unconstitutionality, *see e.g.,* 908 F.2d at 914, 916.

remand is not required to determine application of *Croson*, (i) on equal protection or (ii) whether, if applicable, in assaying Title VII, *Croson* is met. Chief Judge Tjoflat and Judge Johnson do not join in this section because they believe that the claim that Metro Dade affirmative action violates the Equal Protection Clause of the Fourteenth Amendment should be remanded to the District Court for consideration in light of *Croson*. Chief Judge Tjoflat concurs additionally in his concurring/dissenting opinion.

*Croson* made clear that a strict scrutiny standard will now be applied by a majority of the Supreme Court to race-based affirmative action plans in the public employment context.[24] However, the determination that strict judicial scrutiny is the appropriate standard of review only serves as the first step. The more difficult determination is the proper application of that standard. In *Wygant*, the plurality established two prongs to the strict scrutiny analysis: "First, any racial classification 'must be justified by a compelling governmental interest'.... Second, the means chosen by the State to effectuate its purpose must be 'narrowly tailored to the achievement of that goal.'" *Wygant*, 476 U.S. at 285, 106 S.Ct. at 1852, 90 L.Ed.2d at 275 (Powell, J., joined by Burger, C.J., and Rehnquist and O'Connor, JJ.). My analysis demonstrates that the Plan satisfies both of these prongs.

### 1. Compelling Purpose

The Constitution requires some showing of prior discrimination by the public employer to justify the remedial use of race-preferential measures. *See Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847, 90 L.Ed.2d at 269 (Equal Protection Clause requires "some showing of prior discrimination by the government unit involved before allow-

ing the use of racial classifications in order to remedy such discrimination") (Powell, J., joined by Burger, C.J., and Rehnquist and O'Connor, JJ.). The plurality opinion adds that "*Hazelwood* demonstrates this Court's focus on prior discrimination as the justification for, and the limitation on, a State's adoption of race-based remedies." *Id.* at 275, 106 S.Ct. at 1847, 90 L.Ed.2d at 269. The majority of the Court in *Croson* held that public employers, like Dade County, "must identify ... discrimination, public or private, with some specificity before they may use race-conscious relief." *Croson*, 488 U.S. at 505, 109 S.Ct. at 727, 102 L.Ed.2d at 889 (opinion of the Court).

Generalized allegations of discrimination in the subject industry, or in education and training, hold little probative value in identifying discrimination in the relevant industry. *See id.* at 503, 109 S.Ct. at 726, 102 L.Ed.2d at 888.[25] Evidence of discrimination in other jurisdictions or on a nationwide basis also have little or no probative value. *Id.* Statements by public officials assigning benign or remedial objectives to an affirmative action program also remains inadequate without additional proof. *Id.* As Justice O'Connor sees it, the foregoing types of generalized evidence are too "amorphous" to justify race-based relief. They do not adequately identify actionable discrimination nor do they permit tailoring of an appropriately narrow remedy. *Id.*

As the Court points out above, *Croson* reaffirmed the use of statistical comparisons between the employer's work force and the composition of the relevant population as probative of a pattern of discrimination. To successfully meet the factual predicate under the first prong of the strict scrutiny standard by employing indirect evidence in the form of statistics, Dade County has the burden of producing evidence that the statistical disparity between the

---

**24.** In his *Croson* dissent, Justice Marshall conceded that in *Croson* "for the first time, a majority of this Court has adopted strict scrutiny as its standard of Equal Protection Clause review of race-conscious remedial measures." *Croson*, 488 U.S. at 551, 109 S.Ct. at 752, 102 L.Ed.2d at 919 (Marshall, J., dissenting.) This majority includes Chief Justice Rehnquist, and Justices White, O'Connor, Scalia and Kennedy. *See also*

*Krupa v. New Castle County,* 732 F.Supp. 497 (D.C.Del.1990).

**25.** *See generally,* Taylor, *The Equal Protection Dilemma of Voluntary State and Local Set–Aside Programs for Minorities and Women,* 27 Hous.Law Rev. 45, 60–61 (1990).

relevant employee and work force populations is at least "approaching a prima facie case of a constitutional or statutory violation." *Id.* at 500, 109 S.Ct. at 724, 102 L.Ed.2d at 886; *see also Wygant,* 476 U.S. at 274–75, 106 S.Ct. at 1847, 90 L.Ed.2d at 269 (plurality opinion), and *id.* at 293, 106 S.Ct. at 1857, 90 L.Ed.2d at 281 (O'Connor, J., concurring). The following issues need be addressed: (i) Does the Dade County firefighter position at issue "require special qualifications"? *see Croson,* 488 U.S. at 501, 109 S.Ct. at 725, 102 L.Ed.2d at 887; (ii) May general population figures be used? (iii) Has the proper geographic scope been employed? and (iv) What degree of imbalance constitutes "approaching a prima facie case" of a violation?

### (i) Does the Dade County Firefighter Position Require "Special Qualifications"?

In *Croson,* Justice O'Connor reaffirmed the significance that the Court places on the nature of the job receiving race-based preferences. *Id.;* and *see* discussion of *Croson, supra.* To determine discriminatory exclusion, unskilled positions are compared to a different statistical pool than for jobs requiring special training. *Id., and see Teamsters,* 431 U.S. at 337–38, 97 S.Ct. at 1855–56, 52 L.Ed.2d at 416–17.

The Supreme Court has given only limited guidance in distinguishing skilled positions from unskilled. In *Hazelwood,* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742, 53 L.Ed.2d at 777, for example, the Court stated that the truck driver position at issue in *Teamsters* required no special qualifications because "the job skill there involved . . . is one that many persons possess or can readily acquire."[26] Likewise, the Court has ruled that entry-level spots in a job training program require no special pri-

or abilities because they are, in fact, "designed to provide expertise." *Johnson,* 480 U.S. at 632, 107 S.Ct. at 1452, 94 L.Ed.2d at 631. On the other hand, the public school teachers at issue in *Hazelwood,* according to the Court, did work in a profession requiring special expertise.[27]

Candidates for selection as a firefighter for Dade County have to meet certain basic requirements (*see n. 6, supra*). However, as the district court found, none of these requirements reach the level of "special expertise." There is no basis for rejecting as clearly erroneous, F.R.Civ.P. 52(a), the trial court's finding that firefighter applicants are "unskilled" for purposes of comparative statistical analysis.

### (ii) When May General Population Figures Be Used?

When the Supreme Court has faced an unskilled position of employment, it has compared the employer's work force both to the area's general population, *Teamsters, supra,* and to the area's generalized labor market, *Weber, supra.* In *Johnson,* the Court reaffirmed both comparisons and suggested that either would be appropriate, expressing no preference between the alternative pools. *Johnson,* 480 U.S. at 631–32, 107 S.Ct. at 1451–52, 94 L.Ed.2d at 630–31 ("In determining whether an imbalance exists that would justify taking sex or race into account, a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise . . . or training programs designed to provide expertise.") (*citing Teamsters, supra,* and *Weber, supra*). In *Croson,* the Court seemed to lump both choices together by referring to

---

**26.** The truck drivers at issue in *Teamsters* were "line drivers." 431 U.S. at 329 n. 3, 97 S.Ct. at 1852 n. 3, 52 L.Ed.2d at 412 n. 3. Line drivers, "also known as over-the-road drivers, engage in long-distance hauling between company terminals." *Id.*

**27.** Lower courts have differed over the status of firefighter recruits. *See Hammon v. Barry,* 826 F.2d 73 (D.C.Cir.1987), *cert. denied,* 486 U.S.

1036, 108 S.Ct. 2023, 100 L.Ed.2d 610 (1988); *Janowiak v. Corporate City of South Bend,* 836 F.2d 1034 (7th Cir.1987), *cert. denied, South Bend v. Janowiak,* 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989). However, because the issue as to whether a position of employment is skilled or unskilled is highly fact specific, the determinations in these cases about the status of firefighters has little binding or persuasive effect.

the "composition of the *relevant* population." *Croson,* 488 U.S. at 501, 109 S.Ct. at 725, 102 L.Ed.2d at 887.

The district court in this case simply looked at the percentages of minorities in Dade County, and compared that with the percentages of minorities employed as firefighters in the Department, to decide whether the disparities justified an affirmative action program.[28] Because there is nothing in this record showing that the use of general population figures is improper, and no attack has in any way been leveled at its use, or assertion been made that a different labor pool should be employed than the general population to determine whether or not there was prior discrimination in the Fire Department, I would approve the district court's usage of the general population for statistical comparative purposes.

### (iii) Has the Proper Geographic Scope Been Employed?

The Supreme Court has yet to give definitive guidance about precisely how to identify the appropriate geographic limits to a labor pool.[29] Accordingly, lower courts have differed sharply over how to define the geographic boundaries for the relevant labor market. *See Hammon,* 826 F.2d at 78 (looking only to the labor force of the District of Columbia itself provided "an entirely artificial comparison," because the fire department recruited in Maryland and Virginia) (Starr, J., concurring); *Ledoux v. District of Columbia,* 820 F.2d 1293 (D.C. Cir.1987) (relying primarily upon a labor pool confined to the geographic borders of the District of Columbia to find manifest

racial and gender imbalances in the D.C. police force), *vacated,* 841 F.2d 400 (D.C. Cir.1988).

In our case, the use of the Dade County geographical boundaries has gone unchallenged, and for good (geographical) reasons. However, Peightal claims that the issue to be considered is the effect of several departmental mergers. The testimony at trial reveals that during the 1970's, there were "several mergers which brought in a number of all white small departments into [the Dade County Fire Department]." However, there is very limited evidence in the record regarding these mergers. Fire Chief Edward Donaldson recalled "three small mergers ... Homestead, Opa–Locka and Miami Springs, none of them having minority employees, and so—which probably, just from that alone increasing, the size of the department also increased by some forty to sixty majority employees." [30]

Although the overall disparity between the percentages of minorities and nonminorities throughout the Dade County Fire Department may have been slightly altered by these mergers (which apparently occurred many years before the Plan was adopted), there is no record evidence that, absent the mergers, a disparity great enough to justify the Plan would not have existed.[31] I conclude that the proper geographic boundaries for comparative purposes were those of Dade County.

### (iv) What Degree of Imbalance is "Approaching a Prima Facie Case" of a Violation?

The statistical imbalance between minorities and nonminorities in the relevant work

**28.** The district court applied pre-*Croson* Title VII criteria to the Plan, i.e., is it designed to alleviate a "manifest imbalance" in minority representation, and does it "unnecessarily trammel" the rights of non-minorities. As I stated, *supra,* that standard has probably been elevated to the constitutional "strict scrutiny" standard.

**29.** *See* Note, *Finding a "Manifest Imbalance": The Case for a Unified Statistical Test for Voluntary Affirmative Action Under Title VII,* 87 Michigan Law Rev. 1986, 2015 (1989).

**30.** Since these three small fire departments were physically within Dade County, this has

nothing to do with any thought of extra-territorial application of the Plan.

**31.** Other than the testimony quoted above, there is absolutely no evidence about the total number of mergers, (although the fire chief testified that "we have had a *number* of such mergers"), or the numbers of firefighters in these all-white departments, or the effect of the merger on overall minority percentages within the Dade County Fire Department. Mergers of existing special districts, including fire departments, is one of the charter functions of Metropolitan Dade County. *See* n. 4, *supra.*

force and available labor pool must be "approaching a prima facie case of a constitutional or statutory violation" before a public employer may voluntarily adopt racial or gender preferences. *Croson*, 488 U.S. at 500, 109 S.Ct. at 724, 102 L.Ed.2d at 886; *see also Wygant*, 476 U.S. at 274–75, 106 S.Ct. at 1847, 90 L.Ed.2d at 269 (plurality opinion), and *id.* at 293, 106 S.Ct. at 1857, 90 L.Ed.2d at 280 (O'Connor, J., concurring). Prior Court rulings indicate what sort of statistical disparity is required to make out a prima facie case of direct discrimination against an employer. The "general rule" is that the disparity must be "greater than two or three standard deviations" before it can be inferred that the employer has engaged in illegal discrimination under Title VII. *Casteneda v. Partida*, 430 U.S. 482, 497 n. 17, 97 S.Ct. 1272, 1281, 51 L.Ed.2d 498, 512 (1977); *see also Hazelwood*, 433 U.S. at 308, 97 S.Ct. at 2741, 53 L.Ed.2d at 777. The Court has also called that sort of imbalance a "gross statistical disparit[y]." *Hazelwood*, 433 U.S. at 307, 97 S.Ct. at 2741, 53 L.Ed.2d at 777, *cited with approval in Croson*, 488 U.S. at 501, 109 S.Ct. at 725, 102 L.Ed.2d at 887.[32]

I find that the percentages of minorities in the Metropolitan Dade County Fire Department, as compared with the percentages of minorities in Dade County, reveals a statistical disparity far in excess of two or three standard deviations.[33]

I would heed Justice Holmes' warning that "[t]he passion for equality sometimes leads to hollow formula" *Postal Telegraph–Cable Co. v. Tonopah & T.R. Co.*, 248 U.S. 471, 475, 39 S.Ct. 162, 164, 63 L.Ed. 365, 371 (1919); *see also Watson v. Fort Worth Bank and Trust*, 487 U.S. 977 at 995, 108 S.Ct. 2777 at 2789, 101 L.Ed.2d 827 at 846 n. 3 (1988) ("we have emphasized the useful role that statistical methods can have in Title VII cases, but we have not suggested that any particular number of "standard deviations" can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination.... Nor has a consensus developed around any alternative mathematical standard"). However, the number of standard deviations in the case before the Court exceeds the approximate minimum to a degree sufficient to avoid the risks associated with the rigid application of an inflexible mathematical formula.

### 2. Narrowly Tailored

The second prong of the strict scrutiny standard requires action whether the Plan is narrowly tailored to achieve the compelling state interest. In essence, this requirement demands that an affirmative action plan " 'fit' with greater precision than any alternative means," *Associated General Contractors Inc. v. San Francisco*, 813 F.2d 922, 935 (9th Cir.1987) (*quoting Wygant*, 476 U.S. at 280 n. 6, 106 S.Ct. at 1866 n. 6, 90 L.Ed.2d at 279), thereby assuring "that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493, 109 S.Ct. at 721, 102 L.Ed.2d at 882. To determine whether the

**32.** For examples of numerical disparities that the Court has held are sufficient to make out prima facie cases, *see Dothard v. Rawlinson*, 433 U.S. 321, 329–30, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786, 797–98 (1977) (state policy of only hiring prison guards between 5'2", 120 lbs. and 6'10", 300 lbs., thus excluding 41.13% of the female population but less than 1% of the male population); *Hazelwood*, 433 U.S. at 303–05, 97 S.Ct. at 2739–40, 53 L.Ed.2d at 774–76 (blacks comprising 1.8% of teachers in rural district in St. Louis County contrasted to 15.4% in all districts combined). *See also Bazemore v. Friday*, 478 U.S. 385, 399–401, 106 S.Ct. 3000, 3008–09, 92 L.Ed.2d 315, 330–32 (1986) (salary disparity between blacks and whites of $331 in 1974 and $395 in 1975).

**33.** To determine whether there was evidence of discrimination against Hispanics in the Department, for example, I compare the expected number of Hispanics in the Department (which is 35.8% × 921 = 330), to the actual number of Hispanics on the firefighter force, which is 127. The difference between the actual number and the observed number is 203.

The standard deviation in this case is equal to the square root of 921 × .358 × .642, or approximately 14.5. *See Castaneda, supra.* To derive the number of standard deviations present in our case, then, we divide 203 by 14.5, to obtain 14 standard deviations. Since 14 standard deviations markedly surpasses the rough limit of 2 or 3 standard deviations, I would hold that evidence of prior discrimination exists.

Plan achieves this requisite fit, focus must be on the following four general considerations: (i) the efficacy of alternative remedies; (ii) the flexibility and duration of the Plan; (iii) the over-or-under-inclusiveness of the Plan; and (iv) the effect of the remedy upon innocent third parties.[34]

### (i) The Efficacy of Alternative Remedies

To determine whether a minority preference program, like the one struck down in *Croson,* is narrowly tailored to serve a compelling state interest, one must inquire whether the local legislature considered "the use of race-neutral means to increase minority" participation. *Id.* at 507, 109 S.Ct. at 728, 102 L.Ed.2d at 890 (majority opinion). In *Croson,* the Supreme Court observed that there was absolutely no evidence in the record that the Richmond City Council considered any alternatives to the racial quota adopted. *Id.* The Court compared this absence of evidence to the situation in *Fullilove,* in which Congress "carefully examined and rejected race-neutral alternatives before enacting the MBE set-aside," *id.* at 507, 109 S.Ct. at 728, 102 L.Ed.2d at 891, and the program therein was found constitutional.

There is evidence in the record that Metro Dade pursued without success other means to increase the representation of minorities in the Department. Chief Edward Donaldson testified at trial that the Fire Department had a recruitment program aimed at minorities. He stated that recruiters were sent to high schools and college campuses to inform and encourage minority students to sign up for the Fire Department's test. Because it was difficult for the Department to find women capable of passing the physical capability test, they apparently had "a very targeted program to identify females and get them interested in the position of firefighter." (Testimony of Jacquelyn Rowe–Dottin, Human Resources Coordinator.)

Moreover, the Department's "Affirmative Action Program" for 1983–83 included a "Summary Agreement" (Agreement) that detailed the planned recruitment efforts of the Fire Department. The Agreement provided for a "recruitment specialist" to organize and implement a "special recruitment program." The duties of the recruitment specialist included presentations at local colleges, high schools, job fairs and career day presentations. In addition, the recruitment specialist was to coordinate with minority and female organizations in order to "inform the entire Dade County community of fire service career opportunities." The Agreement also provided for special programs directed towards minority youth, such as a "Summer Youth Employment Program," which employed minority youths while educating them about fire prevention. Additionally, a group of black firefighters from the Department, the "Progressive Firefighters," was to continue an outreach program to the black community, according to the terms of the Agreement.

The Fire Department's programs to increase the number of minorities in the Department through special outreach and recruitment programs are impressive. Accordingly, I am satisfied that the Department has sufficiently considered and implemented additional remedial alternatives.

---

34. The elements chosen for consideration under the second prong of the strict scrutiny analysis will vary with the particular circumstances of the case. *See Paradise,* 480 U.S. at 187, 107 S.Ct. at 1074, 94 L.Ed.2d at 233 (Powell, J., concurring) (listing the following five factors: (i) the efficacy of alternative remedies; (ii) the planned duration of the case; (iii) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force; (iv) the availability of waiver provisions if the hiring plan could not be met; and (v) the effect of the remedy upon innocent third parties); *see also id.,* 480 U.S. at 171, 107 S.Ct. at 1066, 94 L.Ed.2d at 223 (plurality), and Taylor, *Set Aside Programs, supra,* at 63 (listing the following four factors: (i) the efficacy of alternative remedies; (ii) the flexibility and duration of the program and its waiver provisions; (iii) the relationship between the preference and the relevant labor market; and (iv) the program's impact upon the rights of third parties).

In determining the legitimacy of an affirmative action plan under the narrowly tailored prong, any of the above elements that is outcome-determinative should be included in the analysis.

### (ii) The Flexibility and Duration of the Plan

In determining whether the Metro Dade Plan meets the narrow tailoring requirement, consideration of the flexibility and duration of the program must be given. Courts considering whether a minority preference plan meets the precision requirement emphasize that the government entity should adopt the program for a limited duration to facilitate a periodic re-evaluation of the program. *See, e.g., Fullilove,* 448 U.S. at 513, 100 S.Ct. at 2792, 65 L.Ed.2d at 947 (Powell, J., concurring) ("The temporary nature of this remedy ensures that a race-conscious program will not last longer than the discriminatory effects it is designed to eliminate"); *accord L.D. Mattson, Inc. v. Multnomah County,* 703 F.Supp. 66, 68 (D.Or.1988). In addition, because rigid quotas are by their very nature antithetical to the flexibility mandated by the narrow tailoring requirement, unyielding preferential quotas will normally doom an affirmative action plan. *See Croson,* 488 U.S. at 508, 109 S.Ct. at 729, 102 L.Ed.2d at 891 (highly critical of rigid quotas); *Paradise,* 480 U.S. at 197, 107 S.Ct. at 1080, 94 L.Ed.2d at 240 (O'Connor, J., dissenting) (rigid quota for affirmative action plan is impermissible).[35] The Supreme Court has specifically approved the use of "hiring goals," on the other hand, which do not rigidly dictate a required number of minorities to be hired. *See, e.g., Johnson, Wygant, Weber.*

The Metro Dade Plan does not continue indefinitely, but terminates upon the satisfaction of its affirmative action goals. Ms. Rowe–Dottin testified that "[t]he plan is reviewed annually ... [T]he plan is remedial in nature, and it addresses problems of under-utilization. If they don't exist, then there is no need to set a goal."[36] Moreover, the Plan's hiring provisions are appropriately sensitive to the Supreme Court's distinction between "goals" and "quotas." The Dade County "Affirmative Action Policy and Statement: Goals and Timetables," (AAPS), states:

> Under a system of goals, therefore, the County is never required to hire a person who does not have qualifications needed to perform the job successfully; and the department is never required to hire an unqualified person in preference of another applicant who is qualified.

The Fire Department followed the guidelines outlined in the AAPS, because although it sought to hire 37 Hispanics, it was only able to hire 28. The Department was unwilling to hire unqualified minorities just to meet its goals. Had a strict quota been in place, on the other hand, the Department would have been required to fill these 37 positions with Hispanics. Because the Plan does not endure *in perpetuity,* and because it does not impose rigid quotas, I find that Metro Dade has satisfied this second criterion of the narrowly tailored prong.

### (iii) Over-and-Under-Inclusiveness of the Plan

The crux of Peightal's argument on appeal is that the Plan is both over-and-under-inclusive in its preferential treatment of Hispanics. Peightal maintains that the Dade County minority preference program is over-inclusive because it favors white European Spaniards with no significant cultural or linguistic discernability from non-Hispanic white persons.[37] In addition,

---

**35.** *See* Taylor, *Set Aside Programs, supra,* at 65.

**36.** After the Plan's goals have been achieved, and the Plan terminates, the Fire Department will probably face another problem. Without the Plan, almost no minorities would have been hired in 1983 because of their relatively low test scores. (Of the top 100 persons on the hiring list, only six were Hispanic, none was Black, and one, number 100, was female.) Unless these scores improve, the percentages of minorities in the Department will obviously decrease after the Plan is withdrawn, creating a need for

the Plan once again. I do not address whether the re-implementation of the Plan in such circumstances would be legitimate, since the issue is not before us.

**37.** The Court in *Croson* found the Richmond Plan over-inclusive. *See* 488 U.S. at 506, 109 S.Ct. at 728, 102 L.Ed.2d at 890 ("The gross overinclusiveness of Richmond's racial preference strongly impugns the city's claim of remedial motivation"). The Court here cited *Wygant,* 476 U.S. at 284 n. 13, 106 S.Ct. at 1852, 90 L.Ed.2d at 275 (haphazard inclusion of racial

Peightal argues that the Plan is under-inclusive because the class of persons qualifying for preferential treatment as "Hispanics" fails to include other national and ethnic groups that are susceptible to similar discrimination.

The EEOC definition of "Hispanic," as applied by Metro Dade, includes: "All persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race." Peightal asserts that this definition is over-inclusive because it includes persons who can trace their ancestry to Spain, irrespective of language or culture, but would preclude favorable treatment to persons with Portuguese heritage, for example. According to Peightal, since white European Spaniards with no visibly discernable "Hispanic" characteristics have not been subjected to past or present discrimination, it violates the narrowly tailored prong of the strict scrutiny prong to include them in the favored group called "Hispanics."

While it may seem anomalous to grant employment preferences to a light-skinned descendant of Spanish grandparents who speaks no Spanish and has no individual cultural ties to an American Spanish community or to Spain, (while denying such preferences to the Portuguese-speaking offspring of Portuguese parents), such a situation would not arise under the Metro Dade Plan, because the Plan adopts the EEOC requirement that a person's claim of identification with a certain racial or ethnic group "should accompany strong visible indication that the person *culturally* and *linguistically* identifies with the group he or she claims." (emphasis in original).[38]

As for the Plan's alleged under-inclusiveness, Peightal argues that it excludes, and therefore discriminates against, members of European national origin, Middle Eastern national origin, and Slavic/Russian national origin, while benefitting those of Spanish origin. Peightal claims that Greeks, Italians, Portuguese, Jews, Israelis, Iranians, and others, are all culturally and linguistically discernable and subject to discrimination in the work place as a result of their ethnic characteristics. However, since these groups are not benefited by the Department's minority preference program, Peightal argues that the Plan is therefore unconstitutionally under-inclusive.

However, it is well established that the Equal Protection Clause does not require public employers to institute affirmative action goals for each and every ethnic group that may exist in a community.[39] In adopting an affirmative action plan an employer may rationally limit its application to those minority groups in the local work force that are most in need of remedial efforts. *Cf. Bakke*, 438 U.S. at 359 n. 35, 98 S.Ct. at 2751 n. 35, 57 L.Ed.2d at 774. The Equal Protection Clause does not require a state actor to grant preference to all ethnic groups solely because it grants preference to one or more groups. A state actor does not violate the Fourteenth Amendment so long as "it [is] rational ... to conclude that the groups [the state actor] preferred had a greater claim to compensation than the groups it excluded." *Id.* In Dade County, the two most prevalent minority groups are blacks and Hispanics. We hold that an affirmative action

---

groups "further illustrates the undifferentiated nature of the plan"), and cited *Days*, 482 ("Such programs leave one with the sense that the racial and ethnic groups favored by the set-aside were added without attention to whether their inclusion was justified by evidence of past discrimination"). *Croson*, 488 U.S. at 506, 109 S.Ct. at 728, 102 L.Ed.2d at 890 (majority opinion).

However, the over-inclusiveness at issue in *Croson* is not present in our case, since Metro Dade is not offering hiring preference to any groups, e.g., Aleuts or Eskimos, against which no discrimination has been found.

**38.** If Peightal had successfully revealed that a light-skinned Castillian, for example, with no discernable cultural or linguistic Hispanic characteristics, had been hired as a firefighter in his stead, then his claim of over-inclusiveness would have more force.

**39.** Peightal's standing to bring this issue is dubious, since there is nothing in the record showing that Peightal is a member of any of these unprotected groups.

plan addressing past discrimination against these two groups is rational, and therefore not under-inclusive.

### (iv) The Effect of the Remedy Upon Innocent Third Parties

Unquestionably, Peightal was harmed by the hiring preferences dictated in the Metro Dade Plan. However, a state or local government may constitutionally require innocent nonminorities to share the burden of remedying the effects of past identified discrimination. *See Fullilove* 448 U.S. at 484, 100 S.Ct. at 2777, 65 L.Ed.2d at 928. As the plurality explained in *Wygant:*

> In cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.

*Wygant,* 476 U.S. at 282, 106 S.Ct. at 1851, 90 L.Ed.2d at 274 (Burger, C.J., and Powell, Rehnquist and O'Connor, J.J.) (emphasis in original).

The Plan calls for no layoffs, as in *Wygant,* and it does not impose an absolute bar to the hiring of non-minorities. *See Paradise,* 480 U.S. at 184, 107 S.Ct. at 1073, 94 L.Ed.2d at 231. Accordingly, I would hold that the Plan did not have an unconstitutional effect on non-minorities.

### To Sum It Up

The County has complied with the requirements of the first prong of the strict scrutiny standard by showing a compelling government purpose for the Plan. In particular, I conclude that (i) the firefighter position at issue was unskilled; (ii) the general population was the proper labor pool to use for comparative purposes; (iii) Dade County was the appropriate geographic area; and (iv) the disparity between the percentages of minorities in the Fire Department and the general population was

great enough to justify the trial court's finding of previous discrimination by Metro Dade, and the need for the kind of remedial efforts sought by the Plan.

The second prong of the strict scrutiny standard was also satisfied by Metro Dade, because the Plan was narrowly tailored to meet its remedial objectives. More specifically, the Plan (i) adequately considered and implemented alternative remedies to a minority-preference program; (ii) was flexible and of limited duration; (iii) was not unconstitutionally over-or-under-inclusive; and (iv) did not unnecessarily trammel on the rights of nonminorities.

### V.

### Title VII Not Violated

Judge Brown and Judge Johnson join in this part. Chief Judge Tjoflat dissents. Peightal challenges the Metro Dade Plan under Title VII. The Court can, with confidence, determine that the Plan is valid under Title VII.

There is, first, gross disparity in employment of minorities going back to 1965. By 1975, with increase in the size of the department the percentage of white employees was 89%. By 1983, when the Plan was adopted, the department then numbering 921, the whites comprised 74% with only 11.8% black, 13.8% Hispanic and women 1.3%. This was in contrast to the make-up of the general population (the available labor pool) which was 47% white, 17.3% black, 35.8% Hispanic and 50% female. (See Part I.) Moreover, the disparity was great enough to do more than satisfy the standard deviation test[40] of *Castaneda* and *Hazelwood,* to constitute a "gross statistical disparity", *see* nn. 32 and 33.

In view of the virtually uncontradicted evidence of gross discrimination, the principles of *Wygant, Fullilove* and *Bakke,*[41] and the six Supreme Court decisions[42] upholding the constitutionality of affirmative action programs, and the strict scrutiny

**40.** *See supra,* n. 32 and related text.

**41.** *See* n. 16, *supra.*

**42.** Set forth in n. 17, *supra.*

imperative of *Croson*, the Metro Dade Plan is valid and in full keeping with Title VII.

The District Court judgment on Title VII is correct and affirmed.

### Conclusion

■ In sum, the Court affirms the lower court's decision upholding the legality of the Metro Dade Plan against Title VII challenges. As to whether the Plan is a denial of Equal Protection in light of *Croson*, the case is remanded to the District Court for consideration in the light of *Croson*.

AFFIRMED in part; VACATED and REMANDED in part.

TJOFLAT, Chief Judge, concurring in part and dissenting in part:

I agree with Judge Johnson's conclusion that we should remand appellant's equal protection claim to the district court for reconsideration in light of *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). As *Croson* makes clear, equal protection challenges to affirmative action plans turn on detailed factual evaluations. We, as an appellate court, are ill equipped to make initial factual determinations. Therefore, I think it best that we remand appellant's equal protection claim to the district court so that it may decide the merits of this claim. On remand, the district court, which previously resolved this case without the benefit of *Croson*, will be able to analyze the relevant facts extensively. In this way, we ensure that appellant's claim receives full and fair adjudication.

I disagree, however, with the court's decision to affirm the district court's judgment for the appellee on the Title VII claim. The appellant established a prima facie case showing that the appellee took race into account in deciding not to hire him. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (discussing prima facie showing). The appellee responded by demonstrating that it made this decision in compliance with its affirmative action plan. When "such a plan is articulated as the basis for the employer's decision, the bur-den shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid." *Johnson v. Transportation Agency*, 480 U.S. 616, 626, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987). This case boils down to whether the appellee's affirmative action plan is valid.

Under Title VII, an employer voluntarily may adopt an affirmative action plan to overcome the existence of a "manifest imbalance" in a traditionally segregated job category. *Id.* at 631, 107 S.Ct. at 1451–52. "In determining whether an imbalance exists that would justify taking sex or race into account, a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise." *Id.* at 631–32, 107 S.Ct. at 1452. If the job at issue requires special qualifications, however, "the comparison should be with those in the labor force who possess the relevant qualifications." *Id.* at 632, 107 S.Ct. at 1452. Additionally, a court must consider whether the plan, in its effort to overcome a manifest imbalance, "unnecessarily trammel[s]" the rights of those not benefitted by it (i.e., nonminorities and men). *Id.* at 637–38, 107 S.Ct. at 1455; *Steelworkers v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979). Applying this test, the district court concluded that the appellee's affirmative action plan was valid. Accordingly, it rejected appellant's Title VII claim.

In my opinion, the district court used a flawed methodology to conclude that there is a manifest imbalance between the percentage of minorities employed by appellee and the percentage of minorities in the relevant labor pool. In reaching this conclusion, "[t]he district court ... simply looked at the percentages of minorities of Dade County, and compared that with the percentages of minorities employed as firefighters in the Department, to decide whether the disparities justified an affirmative action program." *Ante* Maj. op. at 1405 (opinion of Brown, J.). The court relied on general population figures because it found that firefighters do not pos-

sess special expertise. General population figures, however, only serve as a proxy for the qualified applicant pool from which the employer is hiring. Where evidence exists "showing that the figures for the general population might not accurately reflect the pool of qualified job applicants," the value of such figures for evaluating the legality of an affirmative action plan is greatly diminished. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 1857 n. 20, 52 L.Ed.2d 396 (1977); *see also Croson*, 488 U.S. at 501, 109 S.Ct. at 725 (equal protection case). In such a case, the court should search for figures that more closely approximate the qualified applicant pool, instead of assuming that the racial composition of the population as a whole reflects the racial composition of the qualified labor pool. *Cf. Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 650, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989) (disparate impact case).

In the present case, the district court ignored evidence of the Dade County Fire Department's minimum requirements for entry-level firefighters, particularly age restrictions. By failing to take these restrictions into account, the district court probably misstated—over or under—the imbalance, if any, between the percentage of minorities employed by the appellee and the percentage of minorities in the relevant (i.e., qualified) labor pool. A large segment of the Dade County population, to which the district court compared appellee's work

force, is no doubt ineligible for an entry-level position as a firefighter.

The district court should have compared the appellee's work force to that segment of the general population of Dade County who qualify for work as entry-level firefighters. While I appreciate the difficulty, if not impossibility, in obtaining labor market figures that precisely identify the racial composition of the qualified applicant pool, the district court, at the very least, could have compared the appellee's work force to those members of the general population of Dade County who fall within the qualified age group (for which figures are readily available). *See Janowiak v. Corporate City of South Bend*, 836 F.2d 1034, 1039–40 (7th Cir.1987); *Hammon v. Berry*, 826 F.2d 73, 77 (D.C.Cir.1987) (denial of rehearing by panel) ("There should be no mistaking the correct benchmark in this case: the relevant labor force consists of persons 20 to 28 years of age in the *Washington metropolitan area*.").[1]

The proper course, then, is for us to remand the Title VII claim so that the district court may correctly decide whether there is a manifest imbalance between the racial composition of appellee's work force and the racial composition of the qualified labor pool. By failing to take this course, the court today validates the district court's clearly erroneous methodology, at the risk of affirming an unlawful affirmative action plan and at the expense of appellant's claim of racial discrimination.[2]

---

**1.** Indeed, the *Teamsters* Court recognized the point I make here. In *Teamsters*, the employer argued that the general population figures "failed to show what portion of the minority population was suited by age, health, or other qualifications" to hold the job in question—line-driver trucking jobs. *Teamsters*, 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23. The Court noted that this attack may undermine "the accuracy of the comparison between the composition of the company's work force ... and the general population of the surrounding communities." *Id.* In that case, however, the diminished value of the statistics was of no moment: the employer still could not explain why qualified minorities whom it did hire were overwhelmingly excluded from the higher paying line-driver jobs; "fine tuning of the statistics could not have obscured the ... 'inexorable zero'" of minority line drivers. *Id.* In our case, there is no "inexorable

zero"; rather, at the time the appellee adopted its affirmative action plan, its work force was comprised of 11.8% African-Americans, 13.8% Hispanics, and 1.3% women. Thus, to judge the legality of this affirmative action plan correctly, it is imperative that we compare the employer's work force to the qualified labor pool rather than the general population.

**2.** The court also appears to have subjected appellant's Title VII claim to the standard reserved for claims brought under the equal protection clause. *See ante* Maj. op. at 1410 (relying on "the principles of *Wygant, Fullilove,* and *Bakke,* ... and the strict scrutiny imperative of *Croson*"); *see also ante* Maj. op. at 1405 n. 28 (opinion of Brown, J.). Were we writing on a clean slate, I might agree with this approach for analyzing Title VII claims involving the affirmative action plans of public employers. The Su-

Therefore, I respectfully dissent from the court's decision to affirm the district court's judgment concerning the appellee's Title VII claim.

JOHNSON, Circuit Judge, concurring in part and dissenting in part:

I agree with Judge Brown's conclusion that the district court's judgment for the defendant, Metropolitan Dade County, on the plaintiff's Title VII claim should be affirmed. However, in my opinion, the plaintiff's claim that the affirmative action program violates the Equal Protection Clause of the Fourteenth Amendment should be remanded to the district court for consideration in light of the Supreme Court's decision in *City of Richmond v. J.A. Croson Company,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

preme Court, however, explicitly has rejected the argument that "the obligations of a public employer under Title VII must be identical to its obligations under the Constitution." *Johnson v. Transportation Agency,* 480 U.S. 616, 627 n. 6, 632, 107 S.Ct. 1442, 1449 n. 6, 1452, 94 L.Ed.2d 615 (1987). Instead, the Court has held that Title VII claims are subject to a different legal standard than equal protection claims. *Id.; see* *also Cunico v. Pueblo School Dist. No. 60,* 917 F.2d 431, 437–38 (10th Cir.1990). Thus, the court appears to have relied on an erroneous legal standard in resolving appellant's Title VII claim. While this error does not affect the outcome here—because the court holds that appellee's affirmative action plan passes its strict scrutiny—the court's approach is clearly at odds with Supreme Court precedent.